822 So.2d 684 (2002)
John W. CAPONE, III, John W. Capone, Jr. and Laverne Capone
v.
ORMET CORPORATION, the State of Louisiana, Through the Department of Transportation and Development and XYZ Insurance Company
No. 2001 CA 0060.
Court of Appeal of Louisiana, First Circuit.
June 21, 2002.
Rehearing Denied August 13, 2002.
*686 Joseph J. McKernan, Gordon J. McKernan, John H. Smith, Baton Rouge, Marvin Gros, Donaldsonville, Counsel for John W. Capone, III, et al.
Robert E. Kerrigan, Jr., Isaac H. Ryan, New Orleans, Counsel for Ormet Primary Aluminum Corporation.
*687 Arlene C. Edwards, Baton Rouge, Counsel for State of Louisiana, Through the Department of Transportation and Development.
Before: FOIL, FITZSIMMONS, DOWNING, KLINE[1] and LANIER[2], JJ.
WALTER I. LANIER, Jr., Judge Pro Tem.
This action is a suit for damages in tort arising out of a single vehicle accident. The defendants are Ormet Primary Aluminum Corporation (Ormet) and the State of Louisiana, Department of Transportation and Development (DOTD). After a trial on the merits, the trial judge found all parties at fault. He assessed 70% fault to Ormet, 20% to DOTD and 10% to the plaintiff, John W. Capone, III. Ormet and DOTD have appealed.

FACTS
On May 8, 1994, shortly after it had commenced raining, Capone lost control of his vehicle as he was negotiating a curve along Louisiana Highway 44, also known as the "River Road", in Ascension Parish. His vehicle first went into the oncoming travel lane of the roadway. After attempting to steer the vehicle from the oncoming traffic lane back into his proper lane of travel, the vehicle fishtailed, crossed the roadway, and slid into the roadside ditch. The vehicle traveled one hundred and twenty (120) feet in the roadside ditch until it collided with a steel I-beam located nine feet and six inches off the roadway. The steel I-beam was in Ormet's custody.
Alumina, bauxite, and numerous other raw materials were processed and transported at the Ormet plant. Bauxite dust consists of a reddish, pink or rust-toned dusty substance. Bauxite was stored outdoors at Ormet; and it was undisputed at trial that, when dry, it could be carried by the wind. Evidence presented at trial on behalf of Capone alluded to the inevitable escape of pinkish dust from the Ormet site onto the River Road.

LIABILITY FOR THE RED DUST ON THE ROADWAY

(Ormet Assignments of error 1 and 2)
The trial court found that reddish dust from Ormet was on the River Road at the time of the accident. It concluded that the red dust created an unreasonable risk of harm on the roadway that caused Capone to lose control of his vehicle and was a cause in fact of the accident. The court also found that Ormet had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time.
In reasons for judgment, the trial court noted that the direct and circumstantial testimony of three witnesses substantiated that the rust-colored dust from Ormet had, in fact, settled on buildings, structures and roadways, and particularly on the River Road. The court, thereafter, quoted from another case, Babin v. Burnside Terminal, Greater Baton Rouge Port Commission, 577 So.2d 90 (La.App. 1 Cir.1990), in which duties to warn motorists of any material that was dropped or tracked onto the highway and to clean up any such material within a reasonable time were imposed on Ormet. A breach of these same duties was attributed to Ormet in the instant case.
*688 Ormet asserts the "trial court erred in finding that materials from Ormet's plant were a cause in fact of the accident" and "in finding that materials from Ormet's plant made the roadway `unreasonably dangerous'".
The standard of appellate review of factual findings in a civil action is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the finding of the factfinder, and 2) the appellate court must further determine the record establishes the finding is not manifestly erroneous (clearly wrong). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La. 1990). Consequently, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. Sistler, 558 So.2d at 1112; Stobart v. State, Through Dep't of Trans. and Dev., 617 So.2d 880, 883 (La. 1993).
The evidence on which the trial court bases its factual findings and conclusions that the reddish dust caused a dangerous condition on the roadway, created an unreasonable risk of harm and was a cause in fact of the plaintiff's injuries, is found in the testimony of three witnesses. The three witnesses were Ronald Braud, Jerome Schexnayder, and Shelby Robert. The strongest witness for the plaintiff, Ronald Braud, operated the wrecker truck dispatched by the state police to the scene of the accident where Braud removed the vehicle. Braud testified that on his way to the accident site, the rear end of his vehicle slightly wiggled in a fishtail motion as he rounded the bend where Capone began to lose control. However, he stated he had "no real problem" since he had previously started slowing down due to his awareness that rain had caused the road to be slick.
During a seventeen-year period prior to the accident, Braud had removed two one-car accidents where people had gone off the road in the vicinity of the Ormet plant. One of those incidents involved a glancing blow with the same I-beam; however, both previous incidents occurred on the other side of the roadway and not in the curve. Braud testified that the roadway surface had also been wet on the occasions of the previous accidents. He did not observe reddish dust or slushy material at the curve, or anywhere on the roadway on the day of the accident. Braud did, however, identify a "slushy" substance on his uniform after lying on the ground to hook up the car on the side of the roadway by the I-beam.
Jerome Schexnayder, the uncle of the plaintiff, testified that he had noticed a pink film on the road by Ormet from time to time before the accident. He stated that he traveled the River Road three to four times per week between January 1990 and May 1994.
Finally, Shelby Robert, who had been a farmer at (and prior to) the time of the accident, testified that he had been personally involved in two accidents on the River Road. One occurred in the 1950's when he was a student; however, he indicated that accident occurred closer to Gonzales than Capone's accident. The second accident happened in 1990 when he came around a curve at night and ran into the back of a vehicle that was without lights.
Even accepting the court's credibility determination that the testimony of Messrs. Braud, Schexnayder and Robert *689 was "believable" and that bauxite dust could escape and settle on River Road, there is no reasonable basis for the trial court's determination that reddish dust existed on River Road in such quantity and consistency that it created a dangerous condition in the curve that caused Capone to lose control of his vehicle. The testimony by each of the three witnesses on which the trial court relied, at best, merely establishes the probability that bauxite dust existed beyond the premises of the Ormet facility, and it had been observed at times on the River Road. Although Braud stated that his tow vehicle fishtailed slightly when he rounded the curve, he noted that it had been raining, the roadway conditions were slick when wet, and that he knew he should slow down given the inclement weather conditions. Braud's statement that he detected what seemed to be a "little light slush on the road" when he approached the location of the accident is later obviated by his admission that he never saw slush or reddish mud at the curve. His acknowledgment that he had reduced his speed prior to reaching the curve because the wet road was slick, indicates that the slick condition applied to areas beyond the Ormet vicinity; thus, reducing the possibility that the red mud caused Capone to lose control of his vehicle. On the other hand, Capone, who was admittedly very familiar with the River Road, stated that he was traveling at the maximum forty mile per hour speed limit in the rain when he rounded the curve in front of Ormet.
The remainder of the court record fails to support the probability that the dust was a cause in fact of Capone's accident. No witness attested to the existence of an unsafe condition at the site that had been caused by reddish dust or mud in the highway during the general time period of the accident. Photographs submitted into evidence reveal red-toned dust on tops of buildings and roadways within the Ormet property and even on top of roofs and steel beams beyond the plant; however, in noticeable contrast, in those same photographs, reddish dust is not portrayed on the River Road. Also significant is the fact that Trooper Wyatt Achord, who investigated the accident, unequivocally stated that he did not see any objects, debris or conditions on the ground or roadway that might account for a car losing control at that point. He also testified that he had no trouble negotiating the highway.
The compared case of Babin v. Burnside Terminal is distinguishable because there was no dispute that there existed a foreign substance on the road that was a cause in fact of the accident. The issue was the source of the foreign substance, not its existence. Moreover, the Babin court had strong circumstantial evidence before it including: the proximity of the substance to Ormet's gate, evidence that the substance was being transported away from the gate in one direction, the material appeared to have been dropped from a truck, and the color of the material was the equivalent of similarly colored material inside the gate. Distinguishably, in the instant case, the court's credibility determination that red dust settles outside the Ormet premises, including on the River Road, is not disputed. This factual finding, however, does not satisfy the legal standard of proof necessary for circumstantial evidence to attribute fault to Ormet. There is no reasonable basis in the record for the trial court's determination that the existence of red dust was of such a nature that it created an unreasonably dangerous condition on the roadway that caused the accident. The evidence, taken as a whole, fails to show that the fact sought to be proven is the most plausible explanation for what occurred, and that no other mutually exclusive fact can reasonably *690 explain the outcome. Babin, 577 So.2d at 96. The trial court's contrary factual finding is manifestly erroneous.
Because the trial court's finding on what caused Capone to leave the roadway has been interdicted by our ruling thereon, we will review the record de novo and make our own determination. Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La.2/20/95), 650 So.2d 742, and the cases cited therein. Trooper Achord testified he had no trouble negotiating the roadway going to the accident site. Ronald Braud testified that his tow truck fishtailed slightly when he rounded the curve, but he knew to slow down because of the existing road and weather conditions. If this was an average day, then approximately 4100 motorists passed on this portion of the roadway, and the record does not reflect that there was any other accident. La. R.S. 32:64 provides, in pertinent part, that "[n]o person shall drive a vehicle on the highway ... at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the ... surface and width of, the highway, and the condition of the weather ...." Capone knew it was raining and was very familiar with the roadway. Because the Ormet red dust did not cause a dangerous condition on the roadway and the trial court found there was no defect in the surface of the roadway, the only reasonable conclusion that can be reached is that Capone was driving too fast for existing road and weather conditions, lost control of his vehicle, over corrected in trying to stabilize his vehicle and drove off the roadway across the shoulder and into the roadside ditch where he traveled approximately 120 feet and struck the I-beam.
These assignments of error have merit.

LIABILITY FOR THE I-BEAM

(Ormet Assignment of Error 3; DOTD Assignment of Error 2)
For purposes of establishing garde, it was stipulated that Ormet leased and maintained the I-beam that supported a conveyor belt that crossed the River Road from the Ormet plant to the bank of the river. It was, furthermore, undisputed that the I-beam was located in the DOTD right-of-way in the roadside ditch alongside the River Road. DOTD had issued the permit for the construction of the I-beam to support a conveyor belt built by Ormet more than thirty-five years prior to the incident at hand. The I-beam was located nine feet six inches from the fog line of the roadway and five feet four inches from the slope of the roadside ditch.
The trial court found that the proximity of the I-beam to a substandard roadway with a narrow two (2) foot wide shoulder and a steeply sloped (1.7:1) roadside ditch created an unreasonably dangerous condition. See Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, pp. 3-8 (La.4/24/98), 712 So.2d 62, 65-66.

The Statutory Law
Louisiana Revised Statutes Title 48 provides for roads, bridges and ferries. Chapter 1 of Title 48 provides for the Department of Transportation and Development (DOTD). The general function of DOTD is provided for in La. R.S. 48:21A as follows:
The functions of the department shall be to study, administer, construct, improve, maintain, repair, and regulate the use of public transportation systems and to perform such other functions with regard to public highways, roads, and other transportation related facilities as may be conferred on the department by applicable law. (Emphasis added.)
*691 Insofar as La. R.S. 48:21A applies to the facts of the instant case, it admonishes DOTD to construct and maintain highways and roads in accordance with applicable law.
The responsibility of DOTD to provide minimum safety standards for highway design, maintenance, and construction is provided for, in pertinent part, in La. R.S. 48:35A and B as follows:
A. The Department of Transportation and Development shall adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter, the state highway system shall conform to such safety standards. The standards for reflective materials used on all work sites in which highway construction, repair, or maintenance is conducted shall be established in accordance with the provisions of Subsection E of this Section.
B. The chief engineer may designate highways within the state highway system for reconstruction or repair at standards which are less than those as approved by the American Association of State Highway and Transportation Officials; however, no reconstruction or repair shall be done on any highway under this Part which results in a pavement width of less than eighteen feet, and all reconstruction or repair done under this Part shall be accomplished within the existing right-of-way. (Emphasis added.)
Additional authority is provided for DOTD in the Louisiana Highway Regulatory Act in La. R.S. 32:2A(1) as follows:
The department, as an exercise of the police power of this state, shall supervise and regulate all traffic on all highways within the state highway system and shall have the authority in its discretion to supervise and regulate all traffic on all highways within this state; promulgate rules and regulations not inconsistent with this Chapter and the general laws relative to highways and their construction, maintenance, and use, and the operation of vehicles and pedestrians thereon; and investigate the highways by utilizing surveys, traffic counts, etc., and effect methods and practices thereto, as in its judgment and experience it deems advisable. (Emphasis added.)
La. R.S. 48:1(11) defines a highway as "a public way for vehicular, mounted, and pedestrian traffic, including the entire area dedicated thereto and the bridges, culverts, structures, appurtenances, and features necessary to or associated with its purposes." (Emphasis added.) See also La. R.S. 32:1(25) and (76). La. R.S. 48:1(15) defines a right of way as "the area dedicated for use as a highway." See also La. R.S. 32:1(57). La. R.S. 48:1(20) defines roadway as "that portion of a highway, improved, designed or ordinarily used for vehicular traffic, exclusive of the berm or shoulder." (Emphasis added.) La. R.S. 48:1(21) defines the shoulder as "the portion of the highway contiguous with the roadway for accommodation for stopped vehicles, for emergency use and for lateral support of base and surface." (Emphasis added.) See also La. R.S. 32:1(65). La. R.S. 48:1(22) defines the roadside ditch as "any ditch constructed or maintained by the highway agency having jurisdiction over the highway, contiguous to the shoulder thereof, for the purpose of draining the highway." (Emphasis added.)
*692 Thus, the legislature has adopted laws that divide state highways into three parts: (1) the roadway designed for vehicular traffic (and not designed for accommodation of stopped vehicles, emergency use, lateral support of the roadway or drainage of the roadway); (2) the shoulder designed for accommodation of stopped vehicles, emergency use and lateral support of the roadway (and not designed for vehicular traffic and drainage); and (3) the roadside ditch designed for draining the highway (and not designed for vehicular travel, accommodation of stopped vehicles, emergency use and lateral support of the roadway). It is possible that land in a highway right-of-way may not fall in any of these categories. The duty owed by DOTD to a motorist in each of these categories is different.
It is hornbook law that statutory provisions should be construed along with the remainder of the statute, and all statutes on the same subject matter should be read together and interpreted as a whole. La. C.C. art. 13; Bays v. Bays, XXXX-XXXX (La.2/21/01), 779 So.2d 754. The powers and duties of DOTD pertaining to highways are provided for in Titles 32 and 48 of the Revised Statutes. The rights and duties of motorists using those highways are provided for in Title 32. Construing the pertinent statutes together is essential to determine whether the I-beam constitutes an unreasonable risk of harm to motorists under the facts and circumstances of this case.
La. R.S. 32:21 provides, in pertinent part, that the provisions of Chapter 1 of the Louisiana Highway Regulatory Act govern the operation of all vehicles upon all highways of the state. La. R.S. 32:1(59) defines a roadway as "that portion of a highway improved, designed, or ordinarily used for vehicular traffic, exclusive of berm or shoulder. A divided highway has two or more roadways." (Emphasis added.) La. R.S. 32:71A provides, in pertinent part, that "[u]pon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway ...." (Emphasis added.) La. R.S. 32:74, entitled "When passing on the right is permitted", in paragraph B provides, in pertinent part, that "[i]n no event shall such movement be made by driving off the pavement or main traveled portion of the highway." (Emphasis added.) La. R.S. 32:79(1), entitled "Driving on roadway laned for traffic", states that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply. (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." (Emphasis added.)
The legislature has adopted these laws that regulate how motorists are required to operate their vehicles on highways. Motorists shall operate their vehicles upon the right half of the roadway. A motorist shall not drive his vehicle off the pavement or main traveled portion of the highway. Thus, it is unlawful for a motorist to travel in his vehicle on the shoulder or in the roadside ditch. When a roadway has been divided into two or more clearly marked lanes for traffic, a motorist shall drive his vehicle within a single lane and shall not move from such lane until he has first ascertained that such movement can be made with safety. No motorist shall drive a vehicle on the highway at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather. La. R.S. 32:64A. A motorist *693 shall drive in a careful and prudent manner, so as not to endanger the life, limb, or property of any person. La. R.S. 32:58. If a motorist violates any of these statutes (rules), he or she is subject to criminal sanctions. La. R.S. 32:57. These Title 32 laws when construed with the laws in Title 48 show that the roadside ditch is not intended for vehicular usage.
The I-beam in this case is located across the roadside ditch 9'6" from the roadway of Highway 44. Thus, the purpose designated for the roadside ditch by the legislative branch of government becomes important in the resolution of whether the I-beam creates an unreasonable risk of harm to vehicular traffic.
La. R.S. 48:1(22) specifically provides as follows:
§ 1. Terms defined
For purposes of this Chapter, the following terms have the meanings ascribed to them by this Section, except where the context clearly indicates otherwise:
. . .
(22) "Roadside ditch" means any ditch constructed or maintained by the highway agency having jurisdiction over the highway, contiguous to the shoulder thereof, for the purpose of draining the highway. (Emphasis added.)
La. R.S. 1:1 et seq. provides rules for interpreting the Revised Statutes, of which La. R.S. 48:1(22) and Title 32 form a part. La. R.S. 1:3 provides, in pertinent part, that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language." See also La. C.C. art. 11. La. R.S. 1:4 provides that "[w]hen the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." See also La. C.C. art. 9. La. R.S. 48:1(22) is clear and unambiguous. Any roadside ditch constructed or maintained by DOTD is for the sole purpose of draining the highway. Because its sole purpose is draining the highway, the roadside ditch, by law, is not designed, constructed or maintained for vehicular travel or use, as are the roadway and the shoulder. It is a settled rule of statutory construction that the mention of one thing in a statute implies the exclusion of another thing. State, Department of Public Safety and Corrections, Office of State Police, Riverboat Gaming Division v. Louisiana Riverboat Gaming Commission and Horseshoe Entertainment, 94-1872, 94-1914 (La.5/22/95), 655 So.2d 292.
In Oster v. Department of Transportation and Development, State of Louisiana, 582 So.2d 1285, 1289-1290 (La.1991) appears the following:
We begin by recognizing, as did the court of appeal, that the drainage ditch in question serves a useful purpose. Draining ditches similar to the one involved in this case are a common feature along the roads and highways throughout this State. The ditch into which Gernard Casbon rode his dirt bike is but one of a series of drainage ditches along Judge Perez Highway. The purpose of these ditches is to keep water from draining onto the travel portion of the Highway and causing a dangerous situation for motorists. Because drainage ditches help make travel along the roads of this state more safe, their utility is great.

. . .
... In this case, the land under scrutiny lies within the Judge Perez Highway right of way. The right of way extends about twenty feet from the edge of the shoulder of the highway. The purpose *694 of the area within the right of way is to provide space for roadway signs, drainage ditches, and future expansion of the roads or shoulders. This area is neither designed nor intended to be used as a track for off-road, recreational vehicular use. Perkins v. State Department of Transportation and Development, 515 So.2d 553, 555 (La.App. 1st Cir.1987), writ denied, 515 So.2d 1114 (La.1987) ( [t]he roadway and shoulder of the highway are intended for vehicular use by statutory definition; the roadside ditch is not so intended. The roadside ditch is constructed and maintained for the purpose of draining the highway). (Emphasis added.)

The Jurisprudence of the Court of Appeal, First Circuit
In Cornish v. State, Department of Transportation and Development, 93-0194, pp. 12-13 (La.App. 1 Cir. 12/1/94), 647 So.2d 1170, 1181, writs denied, 95-0547, 95-0574, (La.5/5/95), 654 So.2d 324, the court found that a cattle guard located over a roadside ditch located eleven and one-half feet from the roadway was not a cause-in-fact of the accident with the following rationale:

The physical characteristics of Hwy. 37 are not unique; many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects. In this instance, that portion of the cattle guard involved in the accident was located approximately 11½ feet from the road. The cattle guard was located more than 200 feet from the point at which Cornish made a conscious decision to leave the road. Cornish lost control of his vehicle when he encountered the steepened shoulder as he approached the cattle guard. In particular, Cornish testified that the shoulder got very steep 50 to 60 yards from the cattle guard. As Cornish was trying to get back onto the road, he testified he was "sucked" down into the ditch and crashed into the cattle guard.

Even if the cattle guard posed an unreasonable risk of harm and Ponchatoula was a custodian for purposes of LSA-C.C. art. 2317, we find that the cattle guard was not a cause-in-fact of the accident, even though it might have been an instrumentality or contributing cause of Cornish's injuries. See Perkins v. State, Department of Transportation & Development, 515 So.2d 553, 555 (La.App. 1st Cir.), writ denied, 515 So.2d 1114 (La.1987); Hart v. Louisiana Power & Light Company, 486 So.2d 936, 938 (La.App. 1 Cir.), writ denied, 488 So.2d 1024 (La.1986). In other words, we find that Cornish's accident would still have occurred absent the assumed fault of Ponchatoula. Therefore, Ponchatoula is not liable, and the factfinder's determination to the contrary is manifestly erroneous. Based on this finding, we pretermit the issues of whether the cattle guard posed an unreasonable risk of harm and whether Ponchatoula was a custodian. (FN8)
. . .
(FN8.) However, we believe this finding in this case is just and proper in light of the need, utility and common practice of locating such crossings within the state right-of-way near the travelled portion of streets and roads. To hold otherwise would subject everyone, who owns property adjacent to a state right-of-way which contains an open drainage ditch, to liability simply because they are in need of an entrance to their property. Such an automatic imposition of liability would be absurd, especially where the accident is caused primarily, if not solely, *695 as a result of an alcohol impaired motorist. (Emphasis added.)
In Perkins v. State, Department of Transportation & Development, 515 So.2d 553 (La.App. 1 Cir.1987), writ denied, 515 So.2d 1114 (La.1987), the court held that there was no duty owed to a motorist to maintain the roadside ditch for vehicular use and a utility pole located on the back of the roadside ditch about five to six feet from the roadway did not pose an unreasonable risk of harm for a vehicle in the ditch. In Perkins, 515 So.2d at 555, appears the following:
It is well settled that the political subdivision which owns or has custody of a public highway owes a duty to the traveling public to maintain the roadway and shoulder thereof in a reasonably safe condition for vehicular use. Myers v. State Farm Mutual Automobile Insurance Company, 493 So.2d 1170 (La. 1986). The roadway and shoulder of the highway are intended for vehicular use by statutory definitions; however, the roadside ditch is not so intended. The roadside ditch is constructed and maintained "for the purpose of draining the highway." Because the roadside ditch is intended for drainage and not vehicular use, there was not duty on the part of either DOTD or the Parish to construct or maintain the utility pole located on the back of the ditch in such a way that it did not pose an unreasonable risk of danger for vehicles in the ditch. See Wilkinson v. Town of Baker, 506 So.2d 739 (La.App. 1st Cir.1987).

The physical characteristics of Old Independence Highway are not unique; many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects. The failure of DOTD to reconstruct the state's highways to meet modern standards does not establish the existence of a hazardous defect. Myers, 493 So.2d at 1173. Neither political subdivision is liable to plaintiffs for their damage. (Emphasis added.)
In Voelkel v. State, 95-0147 (La.App. 1 Cir. 10/6/95), 671 So.2d 478, writ denied, 95-2676 (La.1/12/96), 667 So.2d 523, a motorist veered off the roadway and overturned in the roadside ditch. He filed suit asserting that injuries he received in the accident were infected by raw sewerage in the roadside ditch. The State of Louisiana filed a motion for summary judgment asserting it owed no duty to the motorist under these facts and circumstances. The trial court granted the summary judgment in favor of the State. In Voelkel, 671 So.2d at 481, this court affirmed with the following rationale:
The State's liability for the condition of roadside ditches vis-a-vis motorists has been litigated numerous times. The jurisprudence is consistent that, by statutory definition, (FN3) the purpose of roadside ditches is drainage, not vehicular use, and that the State has no duty to maintain its drainage ditches in such a way that they do not pose an unreasonable risk of harm for vehicles in those ditches. (Citations omitted.)
. . .
(FN3.) See LSA-R.S. 48:1(22).
See also Hebert v. Southwest Louisiana Electric Membership Corporation, 95-405, p. 18 (La.App. 3 Cir. 12/2/95), 667 So.2d 1148, 1166, writs denied, 96-0277 (La.5/17/96), 673 So.2d 607, 96-0798 (La.5/17/96), 673 So.2d 608 (parish had no duty to remove a guy wire and anchor from a roadside ditch and citing Perkins and La. R.S. 48:1(22) as authority); Hanchey v. State, Department of Transportation and Development, 597 So.2d 1252 (La.App. 3 Cir.1992), writ not considered, 604 So.2d 962 (La.1992) (the accelerator *696 on a motorist's vehicle jammed and his vehicle left the roadway and ran into a concrete retaining wall of the roadside ditch of a State highway, citing Perkins); Rogers v. Parish of East Baton Rouge, 577 So.2d 1068 (La.App. 1 Cir.1991), writ denied, 580 So.2d 925 (La.1991) (a motorist left the roadway and struck a reinforced concrete culvert located in a roadside ditch ten or twelve feet from the road; summary judgment in favor of the defendants affirmed by this court on appeal citing Perkins); Wilkinson v. Town of Baker, 506 So.2d 739 (La.App. 1 Cir.1987) (a motorist veered her vehicle off roadway to avoid an oncoming vehicle, ran into the roadside ditch and struck a sewer system manhole structure; this court reversed a trial court judgment in favor of the motorist finding that the manhole structure did not pose an unreasonable risk of danger for a vehicle in the ditch.)
Perkins was cited favorably in Oster. This line of jurisprudence has not been reversed by the Louisiana Supreme Court. However, a writ denial neither approves nor disapproves a court of appeal's rulings. McClendon v. State, Department of Transportation and Development, 94-0111 (La.9/6/94), 642 So.2d 157.

The Jurisprudence of the Louisiana Supreme Court
In Myers v. State Farm. Mutual Automobile Insurance Company, 493 So.2d 1170 (La.1986), a motorist on a State roadway took evasive action and veered right to avoid an oncoming vehicle. His vehicle slid into the roadside ditch and ran into a large oak tree located on the right side of the roadside ditch causing serious injuries to a guest passenger. In Myers, 493 So.2d at 1173, the Supreme Court reversed the trial court and this court's judgments in favor of the plaintiffs with the following rationale:

The physical characteristics of Green-well Springs Road are not unique; many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects. Dr. Olin K. Dart, an expert in civil and traffic engineering and in accident reconstruction, testified that it would be physically and financially impossible to bring all of the state's roads up to modern standards. Mr. Hickey also believed that the state could not possible meet such a burden. We agree. For this reason, the failure of DOTD to reconstruct the state's highways to meet modern standards does not establish the existence of a hazardous defect.
. . .
Thus, the evidence adduced at trial established that all work done on Green-well Springs Road prior to 1977 complied with applicable standards then in effect. In 1977, the lanes were widened, and the roadway and shoulders were resurfaced. Although technically the horizontal clearance was decreased, overall the highway was improved and made more safe for persons traveling on it because the lanes of travel were widened and the surface of the road was improved, but the crown of the highway was not brought any closer to roadside objects. At the time of the accident, the surface of the highway and the markings on it were in good condition. Under these circumstances, we find that the stretch of road in question did not present an unreasonable risk of harm, that is, DOTD did not breach its duty to keep Greenwell Springs Road in a reasonably safe condition. Thus, DOTD is not liable to plaintiff for the injuries sustained by Todd. The trial court was clearly wrong in finding otherwise. The court of appeal erred in affirming this *697 finding. We must reverse. (Emphasis added; citations omitted.)
In Holloway v. State, Department of Transportation and Development, 555 So.2d 1341 (La.1990), a motorist veered off the roadway, went into the roadside ditch and struck two pine trees located just beyond the back slope of the roadside ditch. The trial court rendered judgment in favor of the plaintiff and this court affirmed. In Holloway, 555 So.2d at 1345, the Supreme Court reversed with the following rationale:
The characteristics of Greenwell Springs Road are not unique in Louisiana. Many roads are tree-lined with narrow shoulders and roadside ditches. The state cannot possibly bring all its roads up to modern standards. The failure of DOTD to reconstruct the state's highways to meet modern standards does not establish the existence of a hazardous defect. Manasco [v. Poplus, 530 So.2d 548 (La.1988)], supra. In 1976, no standards existed for overlay work except to use the best engineering judgment. The overlay work done on Greenwell Springs Road complied with DOTD plans. The decision to widen the lanes and reduce the shoulders has been recognized by AASHTO as appropriate highway maintenance. The testimony established that this made Greenwell Springs Road safer. Further, the slope of the ditch at the accident scene met AASHTO standards. Trooper Hart, the investigating officer, testified that he saw no defects in the roadway or shoulder. Facundus testified that the roadway was unobstructed. The state police photographs show an unobstructed roadway with a clearly visible shoulder sloping into a shallow ditch. Under these circumstances, we find that DOTD did not breach its duty to maintain this section of Greenwell Springs Road in a reasonably safe condition.

Moreover, plaintiffs have not shown that a drop-off from the pavement to the shoulder and the absence of a shoulder caused the accident. Trooper Hart testified that the tire tracks showed that the truck left the pavement and went straight into the ditch going farther and farther to the right until it struck the first tree. The tracks did not indicate that Facundus rode on the shoulder trying to regain the roadway. Further, Holloway testified that he remembered being in a terrible lean "pretty quick" after he felt the first tire go off the roadway. While Dr. Rhomberg felt that the drop-off and shoulder contributed to the accident by impairing Facundus' ability to get back onto the pavement, he conceded that other evidence had shown that Facundus did not try to regain the roadway. Facundus testified that he did not ride on the shoulder, but gradually went off into the ditch. Moreover, he was familiar with the road and admitted that he went off the roadway for no reason. Dr. Dart's opinion was that the shoulder played no role in the accident. We agree. The evidence shows that Facundus went straight into the ditch immediately after leaving the pavement. He was not able to get back onto the roadway because he was in the ditch, not because of a drop-off or the shoulder condition. The sole cause of the accident was Facundus' inability to maintain control of his vehicle. Neither a drop-off from the pavement nor the shoulder contributed to this accident. (Emphasis added.)
In Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967 (La.4/24/98), 712 So.2d 62, a motorist veered right to avoid a dog in the roadway, her right wheels went off the roadway onto a narrow shoulder and into the roadside ditch where she traveled 123 *698 feet and crashed into a tree located on the back slope of the roadside ditch at a distance of eight and one-half feet from the roadway. The plaintiff prevailed in the trial court and this court. The Supreme Court reaffirmed Myers and Holloway, but found them distinguishable from the instant case. In Aucoin, 712 So.2d at 65, the Supreme Court observed that DOTD owes a duty to maintain its right of way in a condition that it does not present an unreasonable risk of harm., citing Oster as authority. The court did not discuss or consider the statutory distinctions of the roadway, the shoulder and the roadside ditch that are set forth in La. R.S. 48:1(20), (21) and (22). The court then affirmed at 712 So.2d at 66-67 with the following rationale:
DOTD was fully aware of the substandard condition of the section of Greenwell Springs Road where the accident occurred. While in 1986 the Myers court noted that the physical characteristics of the road were not unique, the facts in this case reveal that by 1990, DOTD could not name a more dangerous road given the combination of dangerous conditions.
We granted DOTD's writ out of concern that DOTD was found liable because it failed to bring an old highway up to current standards. However, after carefully studying the facts peculiar to this case, we agree with the lower courts and find the area where the accident happened unreasonably dangerous. While the roadway in the present case was in good condition, the shoulders were substandard. Should a driver, such as Aucoin, inadvertently travel off the shoulder, the vehicle becomes trapped in a non-recoverable slope and does not have a clear recovery zone. Under these dangerous conditions, DOTD cannot escape liability by claiming that it has no duty to bring this old highway up to current standards.

The combination of more than one dangerous condition was allowed to accumulate by DOTD, rendering this off roadway area unreasonably dangerous to the motoring public. Under these circumstances, DOTD does have a duty to maintain this off roadway area so it does not pose an unreasonably dangerous condition to the motoring public, notwithstanding that the roadway at issue is an old highway. (Emphasis added)
In Cormier v. Comeaux, 98-2378 (La.7/7/99), 748 So.2d 1123, the driver of a vehicle apparently went to sleep, drove off the roadway across the shoulder and into the back embankment of the roadside ditch. The trial court denied recovery, and the court of appeal reversed. In Cormier, 748 So.2d at 1129-1131, the Supreme Court reversed the court of appeal, and reinstated the trial court's judgment with the following observations:

Generally, in other cases such as this one, where no road defect caused the driver to leave the road and the driver hit an object in the DOTD's right of way, the [98-2378 La. 11] DOTD has been relieved of liability. Two cases involved the same highway, the Greenwell Springs Road. Just as in the case at bar, the highway was built in the 1930s and the lanes were subsequently widened, leaving a one-to-two-foot shoulder and an adjacent ditch. In Myers, supra, the driver swerved off the road to avoid a car and ran into a tree in the ditch that had a fore slope of 2:1. In Holloway, supra, the driver left the pavement for unknown reasons and ran into a tree just beyond the back slope of the ditch, 13 feet from the road. In both cases, this Court held that the DOTD had no duty to bring the road up to current *699 standards. In Myers, the Court held that, as in this case, where the travel lanes had been widened which reduced the width of the shoulders, "overall the highway was improved and made more safe for persons traveling on it because the lanes of travel were widened and the surface of the road improved, but the crown of the highway was not brought any closer to roadside objects." 493 So.2d at 1173. In Holloway, the Court held that the road was not unreasonably dangerous in that there were no defects in the roadway or shoulder, and the roadway was unobstructed with a clearly visible shoulder sloping into a ditch.
. . .

As we stated in Graves, one cannot be protected from all risks. Undoubtedly, it would be desirable for the DOTD to design roads so that no accidents would ever occur, however, economic realities make such a goal impossible to reach. Thus, we as a society must determine the lengths we expect the DOTD to go to ensure that our roads are safe. We have expressed this ... standard as "reasonably safe for persons exercising ordinary care and reasonable prudence." Brown, supra. As we stated in Myers, "many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences, and other objects." 493 So.2d at 1173. "[I]t would be physically and financially impossible to bring all of the state's roads up to modern standards." Id. Although we as a society demand that old highways be reasonably safe, the DOTD's duty to maintain old highways does not include the risk that an intoxicated driver will fall asleep and drive off the road at a sharp angle, failing to see a clearly visible roadside obstacle 17 feet from the shoulder, in this case, the back slope of the ditch. (Emphasis added; footnotes omitted.)
In Petre v. State, Department of Transportation and Development, XXXX-XXXX (La.4/3/02) 817 So.2d 1107, a motorist took her eyes off the roadway; the right wheels of her vehicle left the roadway; she attempted to compensate by steering to the left; her vehicle traveled down the roadside ditch and hit a culvert; and her vehicle became airborne, bounced off two trees, overturned and came to rest on a stump. The trial court rendered judgment in favor of the plaintiffs and the court of appeal affirmed. The Supreme Court found that a defective curve in the roadway, the absence of chevrons delineating the curve, a defective shoulder and an unreasonably dangerous slope of the roadside ditch together created an unreasonable risk of harm for vehicular traffic. Petre is distinguishable from the instant case. In Petre, the court found that defects in the roadway (a defective curve and the absence of signage warning of this defect) helped to create an unreasonable risk of harm. As previously indicated, there is no defect in the roadway in this case. Thus, this case appears to be controlled by Myers, Holloway and Cormier, rather than Petre.
The case of Brown v. Louisiana Indemnity Company, 97-1344 (La.3/4/98), 707 So.2d 1240, is very similar to the instant case on the issue of what duty DOTD owes to a motorist who strikes an obstruction in the roadside ditch (such as the I-beam). In Brown, the motorist ran off the roadway in a curve, traveled thirty-nine feet on the shoulder, traveled another thirty feet in the roadside ditch and struck a driveway, became airborne and, thereafter, struck two pine trees. In Brown, 707 So.2d at 1244, the Supreme Court rejected the trial court's determination that DOTD was responsible for any damage caused by *700 the driveway in the roadside ditch with the following rationale:

We must reject, however, the trial judge's determination that DOTD is responsible for any contribution the abandoned driveway may have had to plaintiffs' harm. Plaintiffs offered testimony that the driveway forms a hump at the point where it abuts Hwy 10 and that the entrance to the drive is blocked by high grass, bushes and debris. As a result of these obstructions, plaintiffs contend that the shoulder in front of the driveway is not safe to motorists. According to the testimony of Trooper Michael Ardoin, the investigating officer, after leaving the pavement, Taylor's vehicle traveled thirty-nine feet over the shoulder and thirty feet through the ditch before striking the driveway. It appears, therefore, that Taylor's car hit the driveway some distance from the place at which it joins the road and that his car never came into contact with either the hump or the bushes and debris. Consequently, we find insufficient evidence to support the trial judge's finding that the condition of the shoulder where it meets the drive was a contributing cause of the accident. Further, no evidence was presented at trial to suggest that DOTD has custody of the driveway. In fact, although the driveway is repeatedly referred to as "abandoned," witnesses testified that it is situated on private property and that it has simply deteriorated due to years of non-use. Without passing on the issue of custody, it is clear that any duty DOTD has with regards to the private driveway does not encompass the risk that a motorist will encounter it while traveling through the ditch. Therefore, the trial judge was clearly wrong in finding DOTD liable for any contribution the private driveway may have had to plaintiffs' harm. (Emphasis added.)
Although it is not a case involving a motorist striking an obstruction in a roadside ditch, Netecke v. State, DOTD, 98-1182, 98-1197 (La.10/19/99), 747 So.2d 489, has some excellent discussions of the methodology used to adjudicate these types of cases. In Netecke, 747 So.2d at 494-495, 498 and 499-500, appears the following:
DOTD's duty is to maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La. R.S. 48:21(A); Oster v. Department of Transp. & Dev., 582 So.2d 1285, 1288 (La.1991). DOTD must maintain the shoulders and the area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on or partially on, the shoulder. This duty extends, not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive.
This duty, however, does not render DOTD the guarantor for the safety of all the motoring public. Further, DOTD is not the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Moreover, not every imperfection or irregularity will give rise to liability, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Entrevia v. Hood, 427 *701 So.2d 1146, 1149 (La.1983). The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. Whether DOTD breached its duty to the public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on all the facts and circumstances determined on a case by case basis.
. . .
The unreasonable risk of harm criterion is not a simple rule of law. Rather, it is a criterion established by this Court to facilitate the judicial process required by our Code. As such, it becomes the decision maker's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility.
In attempting to define the test, we have described the unreasonable risk of harm criterion as serving as a guide utilized by the decision maker in balancing the likelihood and magnitude of harm against the social utility of the thing. We have cautioned, however, that such a balancing test does not lend itself well to neat, mathematical formulations. In addition, the decision maker must consider a broad range of social and economic factors, including the cost to the defendant of avoiding the harm, as well as the risk and the social utility of the party's conduct at the time of the accident. Id. In reaching an intelligent and responsible determination, the decision maker must carefully consider all the circumstances surrounding the particular accident under review to determine whether DOTD's legal duty encompassed the risk which caused the plaintiff's injuries and damages and was intended to protect this plaintiff from this type of harm arising in this manner. The imperfection or irregularity must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances.

. . .
Finally, the physical and financial inability of DOTD to maintain the State's roadways, shoulders, and right-of-ways in anything more than a reasonably safe condition has been considered by this Court in the past as a factor in determining whether a particular condition complained of presents an unreasonable risk of harm to the plaintiff.... While the avoidance of all accidents on our State's highways is highly desirable, the question is whether it is reasonable to impose a rule of law which would require DOTD to reconstruct every highway within its control to provide such or face the prospect of tort liability. DOTD's jurisdiction extends over thousands of miles of roads in this State. Considering this, reconstructing all of the highways in this State would be fiscally impossible. Furthermore, the law does not require such an effort... The cost to DOTD to make its highways, shoulders, and adjacent areas safe from all misperceptions of the motoring public would be overwhelming and impossible. Furthermore, placing the burden on DOTD to reconstruct our State's highways and roadways to prevent such misperceptions and foresee such circumstances would create such an onerous burden that DOTD would essentially be rendered the guarantor for the safety of all motoring public and the insurer of all risks. We decline to place such a burden.
DOTD cannot be held responsible for all injuries on the state's highways that result from careless driving. (Emphasis added; most citations omitted.)
*702 In this case, the I-beam is a support structure for a conveyor belt for the Ormet plant. It is painted yellow and black. It has a flashing light and a "truck crossing" sign on it. Capone testified he passed the I-beam hundreds of times and his view of it was not obstructed.
In his reasons for judgment, the trial judge described the Ormet plant operations as follows:
"Mr. Joe Meyers testified that on an annual basis Ormet handles over one million (1,000,000) tons of bauxite on its yard, immediately adjacent to Highway 44. In the thirty-four (34) years prior to the accident, over thirty-four million (34,000,000) tons of bauxite have been handled on the facility. Ormet admitted that when the product is handled and moved it create [sic] the most dust" ...
"According to Ormet employee, Gerald Williams, the alumina conveyor alone handles fifteen hundred (1500) tons of alumina per day, seven (7) days a week. Annually, 570,000 tons of product cross Highway 44 at the alumina conveyor. Mr. Williams testified that the alumina process is 99.9% efficient. Ormet loses.01% or 5,700 tons of its alumina product annually."
The economic value and social utility of Ormet's operations are great.
The evidence presented at the trial shows that millions of cars (4100 per day) have passed on the roadway where the I-beam is located. There was evidence that there have been accidents on the roadway in the vicinity of the Ormet plant, but there was only one accident involving the I-beam and that was a glancing hit. Evidence of the absence of other accidents at the same place is relevant and admissible as tending to show that the place was not dangerous. Ketcher v. Illinois Central Gulf Railroad Company, 440 So.2d 805 (La.App. 1 Cir.1983), writs denied, 444 So.2d 1220, 1222 (La.1984).
It appears that recent decisions of the Louisiana Supreme Court have jurisprudentially amended La. R.S. 48:1(22) to provide that not only must the roadside ditch serve the purpose of draining the highway, but it also must not present an unreasonable risk of harm to motorists using the adjacent roadway. Stated another way, not only must the roadside ditch be engineered to efficiently drain water from the highway, it also must be engineered so as not to present an unreasonable risk of harm to motorists using the adjacent roadway.[3] Because of this apparent conflict between the law and the jurisprudence, we will analyze this case both ways.
Pursuant to the jurisprudence of this court,[4] because of the language of La. R.S. 48:1(22), there is no duty on the part of a governmental entity (state, parish or municipal) to construct or maintain a roadside ditch in such a way that it does not pose an unreasonable risk of harm to motorists on an adjacent roadway. The purpose of the roadside ditch by statute is to drain the highway. Accordingly, the trial court ruling that the I-beam located in the roadside ditch poses an unreasonable risk *703 of harm to motorists on Highway 44 is wrong as matter of law.
Pursuant to the jurisprudence of the Louisiana Supreme Court, whether the I-beam constitutes an unreasonable risk of harm will be determined by the methodology set forth in Netecke.
The statutory law does not support a finding that the I-beam constitutes an unreasonable risk of harm. In addition to La. R.S. 48:1(22), the Title 32 regulations for motorists state a strong legislative (public) policy requiring that vehicular travel must take place on the roadway; vehicular travel on the shoulder, and, thus, in the roadside ditch adjacent to the shoulder, is proscribed. This public policy is enforced by criminal sanctions.
As pointed out in Oster, because roadside ditches help make travel along roadways more safe, their utility is great. See also Graves v. Page, 96-2201 (La.11/7/97), 703 So.2d 566, 573. As observed in the trial judge's reasons for judgment, the Ormet plant is a major processor of bauxite; the I-beam supports a conveyor belt that transports 570,000 tons of alumina per annum; and, thus, the I-beam has great utility. The evidence shows that 4,100 vehicles per day pass on the roadway where the I-beam is located. This indicates that there is a great need for safety for motorists using the roadway. However, over many years, millions of vehicles have passed on the roadway by the I-beam and there has been only one glancing blow accident. The I-beam is marked with yellow and black paint, has a blinking light and has a "truck crossing" sign on it. There is no obstruction to seeing the I-beam from the roadway. The I-beam is just one of many obstacles along the roadway of Highway 44. As indicated in Cormier, Holloway, Perkins and Cornish, many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences, water hydrants, telephone poles and other objects (like the I-beam herein). The cost of removing all obstacles similar to the I-beam from all of the roadside ditches in Louisiana would be prohibitive.
Accordingly, after considering all of these factors, and balancing all of the competing interests, it is concluded that the trial court was manifestly erroneous in finding that the I-beam posed an unreasonable risk of harm to motorists on the roadway and that the I-beam was a cause in fact of Capone's accident.
These assignments of error have merit.

LIABILITY FOR THE CONDITION OF HIGHWAY 44

(DOTD Assignment of error 1)
DOTD asserts the trial court committed manifest error in finding that Highway 44 was defective because it had conditions that created an unreasonable risk of harm.
In his reasons for judgment, the trial judge stated that "[a] two (2) foot shoulder, a 1.7:1 ditch slope and a no clear recovery zone make an I-beam 9'6" from Highway 44 particularly dangerous." The trial court judge also found that "[s]ufficient evidence was not produced to satisfy the four (4) point test of Lee v. State DOTD [635 So.2d 559 (La.App. 3 Cir. 1994)] as to the surface of La. Hwy. 44 on May 18, 1994." The trial judge did not find as a fact that any other condition contributed to creating an unreasonable risk. Even though we have found that the I-beam did not constitute an unreasonable risk of harm, the issue of whether the combination of the 2-foot shoulder, the 1.7:1 ditch slope and the no clear recovery zone does create such a risk still remains.
*704 The trial judge found as fact that Ormet's "red dust ... caused a condition which created an unreasonable risk of harm that caused plaintiff Capone to lose control ...." This factual finding has been found to be manifestly erroneous. As previously indicated in the Cormier case, the Supreme Court observed that generally "where no road defect caused the driver to leave the road and the driver hit an object in the DOTD's right of way, ... DOTD has been relieved of liability." Cormier, 748 So.2d at 1129-1130. Thus, if we follow a Cormier analysis, what caused Capone's vehicle to leave the roadway is crucial. We have concluded that Capone's negligence caused him to leave the roadway; a defect in, and/on, the roadway did not. Pursuant to Cormier, this should conclude our analysis, and we could hold that the combination of the two-foot shoulder, the 1.7:1 roadside ditch slope and the no clear zone of recovery do not constitute an unreasonable risk of harm.
However, out of an abundance of caution, we will also analyze these elements pursuant to the unreasonable risk of harm criterion of Netecke.
As indicated in the jurisprudence of the Supreme Court and this court, there are thousands of miles of highways (roadways) belonging to the state, parishes and municipal governments in Louisiana that have right of ways similar to that in the instant case. The basic purpose of a roadway is to provide transportation of persons, goods and/or services from one place to another. Roadway access to a geographical area results in business, residential and/or recreational development. Obviously, it is morally and socially desirable for all Louisiana roadways to have shoulders that provide safe zones to maneuver under emergency conditions. If such were provided, accidents, injuries and deaths would be avoided. However, in the past, the legislative and executive branches of Louisiana's State government have designed, funded and built roadways that do not have wide shoulders, gently sloping ditches or safe zones to maneuver under emergency conditions. These are legislative and executive branch determinations that the social utility of having roadway access to an area outweighs the risks involved in not having such shoulders, ditch slopes and safe zones. This is particularly true in rural areas where farm-to-market roads, telephone service, electrical service and other utilities, at one time, were difficult to get as compared to urban areas. Thereafter, whenever funding was available to update a highway, roadway or shoulder to present standards, such was done. If funds were not available, it was not done.
In defining and/or establishing a duty, the court should consider economic factors as well as social and moral factors. Entrevia, 427 So.2d at 1149-1150. The economic considerations are particularly pertinent herein. The record presently before us does not reflect (1) how many miles of State (or parish and municipal) roads will be affected, (2) the cost of obtaining or expropriating property to comply with the duty, (3) the cost of reconstruction of the roadways, shoulders and roadside ditches to comply with the duty, (4) the approximate number of accidents that would be avoided by compliance, or (5) the effect of allocating compliance costs on the ability of the State to provide other essential services. What will be the cost of relocating utilities? These factors are critical. Failure to consider these factors could result in severe consequences for the State and/or the public.
If the State (parish or municipality) does not have the economic resources to comply with the duty, what alternatives are available to it? It can either close the road or *705 continue to operate it. If the first alternative is selected, the results could be catastrophic for the owners of residences and businesses. If the second alternative is selected, what is the exposure to liability, and how will this exposure affect the ability of the State to provide other essential services? If the State does not have the economic resources to comply with the duty, (1) how long will compliance take, (2) what will be the exposure to liability in the interim, and (3) what effect will the interim exposure and cost of compliance have on the ability of the State to provide other essential services?
After considering the above factors and all of the other Netecke factors previously considered in this case, we conclude that the two-foot ditch, the 1.7:1 roadside ditch slope and the no clear zone for recovery do not constitute an unreasonable risk of harm, and the trial court judge was manifestly erroneous in so finding.
This assignment of error has merit.[5]

DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered against the Capones and in favor of Ormet and DOTD dismissing the Capones' petition with prejudice. The Capones are cast for all costs of these proceedings.
REVERSED AND RENDERED.
FITZSIMMONS, J., dissents in part and assigns reasons.
DOWNING, J., dissents and assigns reasons.
FITZSIMMONS, Judge, dissenting in part with reasons.
I respectfully dissent from that portion of the judgment that reverses the trial court's finding of liability on the part of the Department of Transportation and Development (DOTD). I would increase the DOTD's percentage of fault.
The majority's limited observation that a roadside ditch generally serves the purpose of drainage overlooks and circumvents relevant issues of the substandard width of the road, the improper tilt of the roadway and the severe lack of adequate shoulder. The trial court premised its finding of an unreasonably dangerous condition, and resulting liability,[1] on the combined proximity of the I-beam to a substandard road that had too narrow a shoulder and a too steeply sloped ditch.[2]See Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, pp. 3-8 (La.4/24/98), 712 So.2d 62, 65-66.[3]
James Clary, an expert in civil engineering and land surveying, with expertise in highway design, safety, signing and maintenance who had previously worked for DOTD, testified that the roadway area did *706 not meet DOTD's minimum tolerable conditions in effect at the time of the accident. He opined that the 9 feet, 7 inch width of the roadway should have been eleven feet wide for safety purposes. Moreover, River Road was not properly tilted. A 4 inch steel pipe that supported a "Truck Crossing" sign and blinking signal was located only 5 feet, 4 inches from the edge of the pavement; the steel I-beam stood only nine and one-half feet from the edge of the travel lane. Minimum tolerable conditions demanded a shoulder larger than the two feet wide one that existed without a sufficient slope. Additionally, there was no guardrail to protect against an impact with the treacherously close I-beam should a car deviate from the travel lane, as had occurred before Capone's accident.[4]
Even more paramount than the existence of substandard conditions is the absence of evidence to demonstrate that satisfactory remedial measures had been taken by DOTD to minimize the dangerous conditions. Failure by DOTD to provide any warning to motorists of the myriad defective conditions should render it liable for the consequences of such an unreasonably dangerous condition. There existed no warning sign facing Capone's lane of travel near the curve that cautioned drivers that the road was substandard;[5] nor was it posted that the I-beam was too proximately located in the DOTD right of way. Moreover, the speed limit was not adequately posted. Indeed, due to the scarcity of signage regulating the roadway, even the experts were confused at trial as to whether the controlling speed limit was 55 miles per hour or 40 miles per hour. Given this composite of conditions that resulted in a dangerous situation, both Ormet, in its capacity of garde of the I-beam, and DOTD, in its responsibility for safety along its roads, should properly bear significant portions of the liability.
DOTD's allocation of liability by the trial court hinged both on the existence of the aforementioned dangerous conditions on, and near, the travel lane that DOTD permitted to accumulate and the fact that the I-beam was located in DOTD's right of way. DOTD initially issued the permit for the alumina conveyor I-beam in 1957. In 1977, a second permit was issued for a 14 inch pipeline on the existing structure. DOTD mowed and cleaned the right of way where the I-beam was located.
Irrespective of the existence of a duty, vel non, to update a roadway to conform to current designs or safety standards, DOTD cannot shelter itself from liability for all unreasonably dangerous defects in the road. Aucoin, 97-1938 at p. 7; 712 So.2d at 66 (citing Dill v. D.O.T.D., 545 So.2d 994 (La.1989).) Design standards, both at the time of the original construction and at the time of the accident, may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm but are not determinative of the issue. Thornhill v. State Department of Transportation and Development, 95-1946, 95-1950, 95-1949, 95-1948, 95-1947, p. 6 (La.App. 1 Cir. 6/28/96), 676 So.2d 799, 804, writs denied, 96-2014, 96-2021 (La.11/8/96), 683 So.2d *707 272. Although DOTD is not the guarantor for the safety of all the motoring public, it bears a duty to keep the highways and shoulders in reasonably safe condition. Netecke v. State, DOTD, 98-1182, 98-1197, p. 8 (La.10/19/99), 747 So.2d 489, 495. The attendant duty to remedy conditions that make the roadway unsafe arises from knowledge of unsafe conditions on the roadway. Orillion v. Carter, 93-1190, p. 4 (La.App. 1 Cir. 6/24/94), 639 So.2d 461, 465, writs denied, 94-2289 (La.11/18/94), 646 So.2d 384 and 94-2272 (La.11/18/94), 650 So.2d 240.
A prerequisite to the imposition of liability on DOTD includes a demonstration of DOTD's actual or constructive knowledge of the condition and a sufficient opportunity to remedy the situation, or at least to warn motorists of its presence, and failure to do so. Orillion, 93-1190 at pp. 4-5, 639 So.2d at 465. That responsibility encompasses the obligation to protect a motorist who inadvertently drives onto the shoulder of the roadway. Graves v. Page, 96-2201, pp. 12-13 (La.11/7/97), 703 So.2d 566, 572; Campbell v. Louisiana Department of Transportation & Development, 94-1052, pp. 5-6 (La.1/17/95), 648 So.2d 898, 901. In this case, the shoulder, which was only approximately 2 feet wide, was patently inadequate, thereby increasing the probability that a vehicle might be forced to utilize the ditch as a situs for regaining control. The evidence amply supports DOTD's awareness of the substandard structural condition of the roadway and shoulder, as well as the existence of obstructions, including the I-beam, within the adjacent right of way.[6]
DOTD's duty to provide a reasonably safe roadway may be diminished by providing adequate warnings of a defect or hazard. The adequacy of the warning depends on the nature of the hazard. Phillips v. Alliance Casualty and Reinsurance Company, 95-2161, p. 3 (La.App. 1 Cir. 11/8/96), 689 So.2d 481, 483. Given the facts and circumstances of this case, DOTD's failure to adequately warn travelers of the existence of a substandard road combined with a severely inadequate shoulder, which in spite of the substandard conditions was flanked by an I-beam that was precariously close to the travel lane, was egregious. The substandard road and shoulder exacerbated the vehicle's tendency to slide into the I-beam. Notwithstanding the flawed conditions of the narrow roadway and the virtual non-existence of a shoulder resulting in an unreasonably dangerous condition, DOTD continued to exercise its discretion to issue an ongoing permit for the I-beam too close to the River Road. Moreover, DOTD failed to minimize the unreasonably dangerous condition caused by the confluence of these conditions, including a failure to adequately warn motorists. DOTD's inaction was a substantial cause of the accident.
Accordingly, it is respectfully submitted that DOTD's dual role as the responsible party for both the roadway conditions and its ongoing approval of the dangerously positioned I-beam should condemn DOTD to an even greater percentage of liability than the original 20% assigned by the court.
DOWNING, J., dissents and assigns reasons.
I dissent. If there was no manifest error in Petre v. State ex rel. Dept. of *708 Transp. and Development, XXXX-XXXX (La.4/3/02), 817 So.2d 1107, rehearing denied, then there is no manifest error in the instant case.
NOTES
[1] The Hon. William F. Kline, Jr., Judge (retired), is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The Hon. Walter I. Lanier, Jr., Judge (retired), is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[3] Query: If the engineering required to properly drain the highway with the roadside ditch conflicts with the engineering required to make the ditch "motorist friendly", which prevails: the duty imposed by law of the legislative branch or that imposed by the jurisprudence of the judicial branch?
[4] Pursuant to Rule 2.1.(d)(1) of the Internal Rules of this court "(a)n en banc sitting is convened when a proposed opinion suggests the overruling of a prior First Circuit opinion on a point of law and in the opinion of the conference an en banc sitting is warranted."
[5] Because of our holdings, it is unnecessary to consider Ormet's assignment of error 4 pertaining to allocation of fault.
[1] Although the court included the presence of the red bauxite dust as an element of the combination, the roadway conditions and presence of the I-beam remained a dangerous condition with or without the reddish dust.
[2] Beginning in 1968, the Louisiana state legislature required DOTD to maintain all highways in conformity with American Association of State Highway and Transportation Officials (AASHTO) standards to the extent possible. See La. R.S. 48:35(A).
[3] In 1999, the Louisiana legislature revised La. R.S. 48:35 to prospectively overrule the portion of Aucoin that imposed liability on the Department of Transportation and Development for failing to maintain and/or reconstruct an existing highway to modern standards.
[4] The pronouncement that the evidence only pointed to one other accident involving the I-beam serves as disingenuous support of a lack of accidents because the plaintiffs were statutorily barred from the discovery of DOTD's records of prior accidents. The number of prior accidents involving the I-beam in question was, in reality, not practicably ascertainable. DOTD should not be able to utilize its protection from disclosure of such evidence as an implication that there were no additional incidents involving the I-beam.
[5] The single sign was located further down the road beyond the site of the accident.
[6] Most recently, in a case in which the driver's blood alcohol level was found to be .247, the Louisiana Supreme Court found DOTD to be fifty percent liable because the highway's shoulders were defective as to both width and slope and the department possessed knowledge of the defect. Petre v. State, Department of Transportation and Development, XXXX-XXXX (La.4/3/02), 817 So.2d 1107.