PENZATO, J.
This is an appeal by Appellant, the State of Louisiana through the Department of Transportation and Development (DOTD), seeking to reverse a jury verdict in favor of Appellees, Mitchell Johnson, Jr., and David and Shayla Lanus. Mr. Johnson answered the appeal seeking to increase the general damages awarded to him and reduce the allocation of fault assigned to Shawnette Taylor. The Lanuses answered the appeal seeking to reduce the allocation of fault assigned to Ms. Taylor. For the reasons set forth below, we affirm the trial court judgment, and deny the answers to the appeal.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
On June 24, 2014, Mitchell Johnson, Jr., David Lanus, Sarai Lanus, age nine, and Daylon Lanus, age six, were fishing on the side of Louisiana Highway 928, also known as Bluff Road, in Prairieville, Louisiana. At the same time, Ms. Taylor was driving her *886 vehicle on Highway 928 and left the roadway striking the individuals who were fishing on the side of the road, resulting in the deaths of Sarai and Daylon Lanus and injuries to Mr. Johnson and Mr. Lanus. Mr. Johnson filed suit against DOTD, Ms. Taylor, and Geico Casualty Company, her automobile liability insurer. His suit was consolidated with another suit filed against the same defendants by David and Shayla Lanus, the parents of Daylon and Sarai, who filed a wrongful death claim for their injuries from the deaths of their children, as well as a survival action for their children, and for David's own injuries.
The plaintiffs alleged that the area of the accident was in the care and custody of DOTD and that DOTD was negligent in the construction and maintenance of Highway 928. The plaintiffs also alleged that Ms. Taylor was negligent in leaving the paved roadway.
After a trial, the jury found that the roadway or right-of-way was defective, that it created an unreasonable risk of harm, and that DOTD had knowledge of this condition. The jury awarded damages to all plaintiffs and assessed DOTD with sixty percent fault and Ms. Taylor with forty percent fault. On January 11, 2017, the trial court signed a judgment in accordance with the jury verdict. On February 6, 2017, the trial court signed a document entitled "Supplemental Judgment With Written Reasons."[1] It is from both these documents that DOTD appeals. This court only has jurisdiction over the January 11, 2017 judgment.
ASSIGNMENTS OF ERRORS
DOTD claims that the following errors were committed at the trial court:
(1) The jury improperly imposed a duty to protect and safeguard individuals who were neither motorists nor pedestrians, were more than 13 feet beyond the roadway, and whose presence and activity bore no connection to the roadway or its function;
(2) The jury imposed liability for a harm well beyond any reasonable scope of the duty owed by the DOTD;
(3) The jury incorrectly imposed a duty to comply with modern standards in connection with a rural roadway where there had been no major reconstruction under the law, there were no prior accidents, and nothing distinguished this location as in need of repair from the multiplicity of other areas in greater need of [DOTD's] limited road funds;
(4) The jury improperly identified an unreasonably dangerous condition *887 under facts which cannot support this finding through a faithful application of the "risk-utility" test set by the Louisiana Supreme Court;
(5) The jury failed to consider or give due regard to the fiscal and financial inability of [DOTD] to maintain its roadways in anything more than a reasonably safe condition; in so doing, the jury's verdict improperly holds [DOTD] strictly liable in violation of the principles set forth in Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La. 1986), and similar cases;
(6) The jury, applying an improper and inflated duty, identified a breach when none existed under the facts and governing law;
(7) The jury erred in identifying causation in a case where the tortfeasor, either as a result of a seizure or in a gross over-reaction to a phantom vehicle, exited the roadway quickly, made no attempt to return to the roadway, and struck persons off of the road one second after leaving the pavement;
(8) The jury, in violation of [La.] R.S. 9:2800, identified liability despite the absence of evidence of any sort to establish, or even suggest, that [DOTD] knew or should have known of an unreasonably dangerous condition in a location with no prior accident history, in a straight portion of the roadway, and where it neither knew nor should have known that one area off of the road was allegedly a fishing spot;
(9) The jury's verdict was in error because no road defect caused the tortfeasor/driver to leave the roadway;
(10) The trial court grossly misapplied the "401-403" balancing test when it barred critical evidence that the tortfeasor had a twenty-year seizure condition which was the most likely cause of the accident; and,
(11) The jury erroneously assessed only forty percent fault to Ms. Shawnette Taylor when her reckless conduct was the primary, if not sole cause of the accident.
STANDARD OF REVIEW
It is well-settled that a court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Accordingly, appellate review of the factual circumstances and evidence of the case will not be the basis for reversal of the trial court's judgment, in the absence of manifest error, even if the court of appeal is convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell, 549 So.2d at 844. If the factual findings are found to be reasonable and supported by the record, the trial court's determinations must be given much discretion, especially in regard to the credibility of witness testimony, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, 549 So.2d at 844. Consequently, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. Stobart v. State, Dep't of Transp. & Dev., 617 So.2d 880, 883 (La. 1993). Furthermore, in applying the manifest error standard where the jury makes a finding *888 of liability on the part of DOTD, the reviewing court must presume that the jury concluded that the plaintiff carried the four-pronged burden of proof. Netecke v. State, Dep't of Transp. & Dev., 98-1182 (La. 10/19/99), 747 So.2d 489, 495.
The reviewing court must review the record in its entirety to determine whether the factfinder's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882-83. The Louisiana Supreme Court applies a two-part test to determine if a factfinder's determinations warrant reversal: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Graves v. Page, 96-2201 (La. 11/7/97), 703 So.2d 566, 573.
RELEVANT TESTIMONY
The Roadway and Right of Way
Highway 928 has existed since the 1930's and began as a gravel roadway. In 1965, Highway 928 was modified from a gravel, shell, nine-foot roadway to a twenty-foot wide hard surface roadway. In 1985, 2006, and 2010, overlay work was done on Highway 928, some of which widened the driving portion of the roadway, but narrowed the shoulder.
At the time of the accident, beyond the white fog line, there was a six-inch asphalt shoulder followed by twelve inches of flat grass. Adjacent to the eighteen-inch shoulder was a steep slope that descended into a body of water. DOTD refers to the area as a "ditch" throughout its brief. However, the testimony at trial was that the area of water was over seventy feet wide, at least six feet deep, and used for fishing. Photographs introduced into evidence reflected that water was present on both sides of the roadway with large pipes underneath allowing water to flow back and forth. The area was also referred to as a very large swamp area, a bayou, and/or a canal during the trial. On the date of the accident, the plaintiffs were fishing near a cement culvert headwall which was 13.8 feet from the paved portion of the roadway and at the bottom of the slope.
Ms. Taylor's Testimony
Ms. Taylor testified that she drove Highway 928 regularly, and on the date of the accident was driving a Nissan Armada. She did not see the plaintiffs before the accident, and was traveling about 40 to 45 miles per hour, below the posted speed limit of 55 miles per hour. She left the roadway at a straight portion between two curves. She testified that a vehicle swerved toward her lane and she turned the steering wheel just to move over and get back in the lane.[2] When she tried to get back on the roadway, her steering wheel started shaking and she stated nothing was moving. She testified that her car was being pulled and that she did everything she could do to get it back onto the roadway.
Trooper Hall's Testimony
Trooper Joseph Hall, who investigated the accident, testified that the speed limit in the area was 55 miles per hour, and he also described the area of the accident as a straight piece of roadway between two curves. According to Trooper Hall, at the accident scene, Ms. Taylor was very distraught, *889 crying, and appeared overwhelmed. He testified that although Ms. Taylor gave a statement at the scene, she came into the police station a few days later and gave another statement that differed somewhat from the first one. During the statement given at the police station, Ms. Taylor stated that a vehicle heading in the opposite direction got close to the center line, causing her to move to the outside of her lane to avoid being sideswiped when her vehicle ran off the roadway. Ms. Taylor reported to Trooper Hall that when she began going down the embankment, her steering wheel began to shake, she closed her eyes, and continued down the hill. He further testified that the day was clear, the road was in good condition and free of debris, there were no tire marks on the roadway, and there was no drop-off from the roadway to the grass shoulder.
Mr. Elisar's Testimony
Aaron Elisar, the DOTD project engineer, testified that a maintenance superintendent who works under him performs bi-weekly inspections of the roadway to look for dangerous conditions such as dips, potholes, irregular striping, drop-offs, and damage to existing guardrails. The maintenance superintendent should also look for the same dangerous conditions in the areas of the right-of-way. Mr. Elisar travelled Highway 928 regularly, but neither he nor the maintenance superintendent performed inspections to determine if a site would meet AASHTO[3] standards warranting guardrail placement. Mr. Elisar maintained that guardrails are usually installed on the edge of a bridge to protect vehicles from the blunt end of the bridge. The culvert at the site of this accident, however, had no blunt end.
While he lived near the area, Mr. Elisar testified that he had never seen anyone fishing in the area of the accident. He indicated that DOTD does not own "No Fishing" signs. He stated that the site of the accident was a rural area with no pedestrian facilities, such as buildings or sidewalks. DOTD considered pedestrians predominantly in urban settings and where there were already in existence pedestrian facilities or areas where pedestrians may congregate, such as near a school. Therefore, DOTD did not anticipate pedestrians to be present in the area of the accident. However, Mr. Elisar acknowledged he was aware of a right to fish in this area.
Other Lay Testimony
There was also evidence presented to the jury that individuals fished at this location for a number of years. Mitchell Johnson, Sr., Mr. Johnson's father, testified that he had been fishing in this location as long as he could remember and brought Mr. Johnson there as a child, along with Mr. Lanus, his cousin. Mitchell Johnson, Sr., also testified that on one occasion the "police" were called by a nearby resident regarding parking on the other side of the road. The officer, while advising that he could not restrict fishing, instructed him to fish on the opposite side of the road, which was the side where this accident ultimately occurred.
Jason Darville, Mr. Lanus's brother, testified that the two of them and their parents fished "plenty of times" in the location of this accident when they were younger. He also testified that he often saw people fishing there, and sometimes had to choose a different spot because other people were already at that location.
*890 David Darville, Mr. Lanus's father, also testified that he took Mr. Lanus fishing in this area when he was a child and that other people fished in this area "all of the time." David Darville further stated that he previously received a ticket from a game warden in this area for fishing without a license. He maintained that people from Dutchtown, Baton Rouge, and St. Gabriel all fished in this location.
Mr. Lanus testified that at the area of the accident, there were no signs warning not to fish in the area. He further stated that had there been a "no fishing" sign or a fence, he would not have fished in the area.
Expert Testimony
Plaintiffs' Expert
Dean Tekell, a professional civil engineer, testified on behalf of the plaintiffs as an expert in the areas of traffic operations, traffic safety, and highway design. Mr. Tekell testified that the 1965 DOTD plans for Highway 928 called for a 3:1 slope, which provided a one foot drop every three feet from the edge of the road. According to Mr. Tekell, in many places along Highway 928, the 3:1 slope was maintained. He also explained that even a 3:1 slope was non-recoverable, meaning that once a vehicle left the roadway, it is not likely to regain the roadway without assistance. At the area of the instant accident, there was a drainage structure, a culvert with a headwall, which caused the slope to be steeper than 3:1, at 2:1. The cement headwall measured 70.1 feet wide and the body of water was wider than the headwall. The cement culvert was approximately 13.8 feet from the edge of the roadway. Mr. Tekell testified that Ms. Taylor left the roadway at an angle of 10 to 14 degrees and traveled approximately 50 feet from the roadway until her vehicle reached the headwall. He believed that based upon her speed on the slope, she was braking; however, she struck the plaintiffs one second after she left the roadway.
Mr. Tekell testified that a lack of usable shoulder and the excessive side slope were the primary causes of this accident. He further opined that during the 2010 overlay project, DOTD should have placed a guardrail in the area where Ms. Taylor left the roadway based upon applicable AASHTO standards at the time. Mr. Tekell stated that the area of this accident was an excellent site for a guardrail. He maintained that the narrow shoulders and the steep slope are factors to be considered when deciding whether to place a guardrail, as well as in this case, the existence of a headwall thirteen feet from the roadway and a body of water thereafter. While he admitted that guardrails can create danger by redirecting motorists into oncoming traffic, it was his opinion that a guardrail would have altered the path of Ms. Taylor's vehicle.
Mr. Tekell explained that any time there is an object such as a body of water or culvert with a headwall, the rule to follow is "correct, protect, or warn." Correction would involve removing the obstruction, such as flattening the slopes or extending the culvert headwall further from the edge of the roadway. If those measures are not cost-effective, he stated the agency should protect, with a guardrail being a classic example. If that is not viable, warnings such as signs or fencing should be used. Even though he testified that no major reconstruction took place on Highway 928, he opined that DOTD was still under a duty to discover any hazards and correct them. He further testified that DOTD should take into consideration the right to fish in bodies of water when making safety decisions.
Ms. Taylor's Expert
Douglas Robert, a professional civil engineer who testified on behalf of Ms. Taylor, *891 testified that on most of Highway 928 there was a six-inch paved shoulder and twelve inches of flat grass with a 3:1 slope along the roadway, which became steeper, close to 2:1, and even harder to recover at the site of the accident. Mr. Robert agreed with Mr. Tekell that the shoulder was inadequate and unusable because it was limited with regard to the width of the tire, and a guardrail was warranted under AASHTO standards considering the conditions present. He specifically stated that the design of Highway 928, including the lack of an adequate shoulder, an increased slope, and water at the bottom of same, caused the accident and warranted a guardrail.[4] Contrary to Mr. Tekell, Mr. Robert testified that the 1965 widening of Highway 928 from a nine-foot gravel roadway to a twenty-foot wide hard surface was a "reconstruction." He explained that in 1965, the 1962 AASHTO standards were in effect, calling for a 3:1 slope. Therefore, using the 1962 AASHTO standards, he testified that an eight-foot shoulder with a 3:1 slope should have been constructed. He also concluded that a three-foot shoulder, as called for in the 1965 DOTD plans, would have provided Ms. Taylor more time to react than the eighteen-inch shoulder allowed. He further testified that even though a 3:1 slope would still have been non-recoverable, the difference in the slope would have affected the direction in which the vehicle proceeded down the slope and where it ultimately traveled.
Mr. Robert agreed that Ms. Taylor struck the plaintiffs within one second of leaving the roadway, that the physical evidence showed Ms. Taylor made no evasive maneuver to regain the roadway, and that she traveled a straight path into the plaintiffs. On cross-examination, he conceded that widening the roadway while compromising the width of the shoulder made the roadway safer.
DOTD's Expert
Dr. Joseph Blaschke, DOTD's expert in highway design and traffic engineering, testified that the accident occurred during the day in dry conditions and that driver error caused the accident. He described the area as swampy, with a relatively narrow right-of-way and curvy design, with drainage and a large culvert underneath the roadway, apparently built in the 1960's when the roadway was overlaid the first time. He explained that the slope is steep as there is a narrow roadway and right-of-way, providing limited room for drainage within the right-of-way. Dr. Blaschke testified that usually rural areas are not designed for pedestrians. He also testified that even though Ms. Taylor's vehicle went beyond the fog line, her vehicle would not have encountered the slope until her entire vehicle left the roadway. He opined that a roadside slope should be no steeper than 3:1. Dr. Blaschke explained that widening the travel lanes at the expense of narrowing the shoulder is considered to be a good trade-off. He defined a "reconstruction" as taking an existing roadway and reconstructing it to current design standards. He disagreed that the 1965 project was a reconstruction "in today's terminology", and testified that AASHTO does not require older roads to be brought up to modern standards. On cross-examination, however, he admitted that he did not disagree with Mr. Robert that under AASHTO's 1965 definition of reconstruction, the project could have been considered a major reconstruction. Dr. Blaschke determined that from the time Ms. Taylor left the roadway until she hit the plaintiffs, *892 approximately one second or slightly more elapsed; therefore, it was unrealistic to think she had time to struggle with or turn her vehicle back.
He disagreed with the opposing experts that a guardrail was warranted at the site of the accident, explaining that guardrail use is discretionary, even after AASHTO set forth in 1977 the conditions which warranted or justified a guardrail. He confirmed on cross-examination that DOTD has the obligation to inspect the roadway and ensure that it removes unreasonable hazards. Dr. Blaschke also testified that if he was aware there was an issue with fishing in an area, it would be logical to him to erect a sign or fence to keep pedestrians from being there.
LAW AND DISCUSSION
In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, that defendant owed a duty to plaintiff which defendant breached, and that the risk of harm was within the scope of protection afforded by the duty breached. Campbell v. State, Dep't. of Transp. & Dev., 1994-1052 (La. 1/17/95), 648 So.2d 898, 901 (citing Mundy v. Dep't. of Health and Human Resources, 620 So.2d 811 (La. 1993) ).
Regarding DOTD's liability, the pertinent legal principles are somewhat different insofar as tort claims may be pursued against the public entity in strict liability pursuant to La. C.C. art. 2317 and La. R.S. 9:2800, as well as in negligence pursuant to La. C.C. art. 2315. Netecke, 747 So.2d at 494. When addressing an action under either theory, the legal analysis is the same. The plaintiff bears the burden of showing that: (1) DOTD had custody of the thing that caused the plaintiff's injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries. Netecke, 747 So.2d at 494.
Louisiana law imposes a duty on DOTD to design, construct, and maintain Louisiana's highways. To further this end, La. R.S. 48:35(A) requires DOTD to "adopt minimum safety guidelines with respect to highway and bridge design, construction, and maintenance." Those guidelines are required to "correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [AASHTO]...." La. R.S. 48:35(C). Furthermore, DOTD has "a duty to maintain, repair, construct, or reconstruct any public road, highway, bridge, or street, or any portion thereof, in a manner that is not unreasonably dangerous for a reasonably prudent driver." La. R.S. 48:35(E)(1)(a).
The primary duty of DOTD is to continually maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La. R.S. 48:21(A) ; Netecke, 747 So.2d at 494-95 ; Myers , 493 So.2d at 1172. DOTD's duty is not limited to just the roadway. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. Brown v. Louisiana Indent. Co., 97-1344 (La. 3/4/98), 707 So.2d 1240, 1242. The duty extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition.
*893 Rosen v. State, Dep't of Transp. & Dev., 2001-0499 (La. App. 4 Cir. 1/30/02), 809 So.2d 498, 507, writ denied, 2002-0605 (La. 5/10/02), 815 So.2d 842. This duty extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Netecke, 747 So.2d at 495.
As to the area off the shoulder of the road, but within the right-of-way, DOTD owes a duty to maintain the land in such a condition that it does not present an unreasonable risk of harm to motorists using the adjacent roadway or to others, such as pedestrians[5] who are using the area in a reasonably prudent manner. Cormier v. Comeaux, 98-2378 (La. 7/7/99), 748 So.2d 1123, 1127. It is DOTD's knowledge, constructive or actual, which gives rise to the obligation to take adequate measures necessary to prevent injury. See Rhodes v. State, Dep't of Transp. & Dev., 95-1848 (La. 5/21/96), 674 So.2d 239, 242. DOTD cannot knowingly allow a condition to exist that is a hazard to a reasonably prudent driver, but must take reasonable measures to eliminate or reduce the risks associated with the dangerous condition or may warn the public of the danger, risk, or hazard involved. Tassin v. Bendel, 2007-1119 (La. App. 4 Cir. 7/9/08), 989 So.2d 217, 226, writ denied, 2008-1940 (La. 11/10/08), 996 So.2d 1069, cert. denied, 556 U.S. 1222, 129 S.Ct. 2161, 173 L.Ed.2d 1157 (2009).
Nonetheless, DOTD is not a guarantor of the safety of all the motoring public under every circumstance. Nor is DOTD the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway. Netecke, 747 So.2d at 495. Furthermore, DOTD's failure to reconstruct the state's highways to modern standards does not establish the existence of a hazardous defect in and of itself. Myers, 493 So.2d at 1173. DOTD has no duty to bring old highways up to modern AASHTO standards, unless a new construction or major reconstruction has taken place. Harris v. State, Dep't of Transp. & Dev., 2016-524 (La. App. 5 Cir. 6/15/17), 223 So.3d 695, 706. Nevertheless, DOTD has a duty to correct conditions existing on old highways that are unreasonably dangerous. Toston v. Pardon, 2003-1747 (La. 4/23/04), 874 So.2d 791, 799.
Moreover, the duty of DOTD to maintain public roads in safe condition includes, among other things, the specific duty of providing proper safeguards or adequate warnings of dangerous conditions on highways. Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 2007-0158 (La. App. 4 Cir. 7/2/08), 989 So.2d 164, 183-84, writ denied , 2008-1768 (La. 10/31/08), 994 So.2d 539 (citing Reid v. State, Dep't of Transp. & Dev., 25,778 (La. App. 2 Cir. 5/4/94), 637 So.2d 618, 623 ).
Liability of DOTD
As outlined previously, the plaintiffs had the burden of proving (1) DOTD had custody of the thing that caused the plaintiff's injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries. Netecke, 747 So.2d at 494. There is no dispute that the roadway and right-of-way were in the custody and control of DOTD.
*894 Unreasonably Dangerous Condition
Plaintiffs allege DOTD's liability stems from the unreasonably dangerous condition of the combination of the narrow shoulder (eighteen inches), non-recoverable slope, and water at the bottom of the slope, with no guardrail or a warning to the public not to fish. DOTD disputes that the roadway and shoulder were defective.
In DOTD's assignments of error numbers four, five, and eight, DOTD challenges the jury finding that an unreasonably dangerous condition existed. The jury found an unreasonably dangerous defect in the roadway or right-of-way that was a substantial factor in causing plaintiffs' damages. DOTD, relying on Forbes v. Cockerham, 2008-0762 (La. 1/21/09), 5 So.3d 839, 858-59, first argues that the duty to maintain roads and shoulders does not require it to bring old highways up to modern standards unless and until a major reconstruction has taken place. However, just because an older road need not be brought up to modern standards, DOTD is not automatically insulated from all liability. See Petre v. State, Dep't of Transp. & Dev., 2001-0876 (La. 4/3/02), 817 So.2d 1107, 1112-13. While the failure to adhere to AASHTO standards may not alone attach liability, DOTD's conformance to those standards or not is a relevant factor in determining whether the roadway is unreasonably dangerous. Petre, 817 So.2d at 1113. DOTD cannot escape liability by simply showing that the highway met the existing standards when it was built. Rosen, 809 So.2d at 507 (citing Aucoin v. State, Dep't of Transp. & Dev., 97-1938 (La. 4/24/98), 712 So.2d 62, 66-67 ). Design standards both at the time of original construction and at the time of the accident may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm, but are not determinative of the issue. Rosen , 809 So.2d at 507-08 (citing Dill v. State, Dep't of Transp. & Dev., 545 So.2d 994, 996 (La. 1989) ). Although DOTD does not have a duty to bring old highways up to modern AASHTO standards absent a major reconstruction of that highway, as explained by the Supreme Court in Cormier, 748 So.2d at 1129, whether DOTD has conformed to those standards is a relevant factor in determining the ultimate issue of whether the roadway is unreasonably dangerous. Aucoin, 712 So.2d at 66. In Aucoin the Supreme Court affirmed the district court findings that the slope of the ditch, the narrowness of the shoulders, and the limited horizontal clearance contributed to the unreasonably dangerous condition of the roadway, and DOTD was held liable. Aucoin, 712 So.2d at 66.
The issue of whether a highway project constitutes a major reconstruction of the highway is a factual issue, rather than a legal issue, although it determines the scope of the legal duty imposed upon DOTD in terms of compliance with applicable design standards. Harris v. State, Dep't of Transp. & Dev., 2007-1566 (La. App. 1 Cir. 11/10/08), 997 So.2d 849, 865, writ denied, 2008-2886 (La. 2/6/09), 999 So.2d 785. For a standard or guideline to be "directly applicable" and admissible for the purpose of determining the existence of an unreasonably dangerous condition, it must have been adopted prior to the date of approval of the original or amended design plan for the last construction or major reconstruction of the roadway. See La. R.S. 48:35(E)(1)(b) and (c) ; Harris, 997 So.2d at 865.
Based upon the conflicting expert testimony detailed above, the jury was presented with evidence that the 1965 widening of Highway 928 could have been considered a major reconstruction. They were also presented with testimony that the slope should have been at least 3:1 according to *895 AASHTO standards in effect in 1965 and the DOTD plans, as opposed to the 2:1 slope present at the site. The eighteen-inch shoulder was also smaller than called for by AASHTO standards (eight foot) and the DOTD plans (three feet). The jury also heard Dr. Blaschke's testimony that the widening performed in 1965 made the roadway safer and complied with AASHTO standards, even if the shoulder was narrowed.
A trier of fact may accept or reject, in whole or in part, the opinions expressed by an expert. Harris, 997 So.2d at 866. Furthermore, where the testimony of expert witnesses differs, the trier of fact has great, even vast discretion in determining the credibility of the evidence and a finding in this regard will not be overturned unless clearly wrong. Cotton v. State Farm Mut. Automobile Ins. Co., 2010-1609 (La. App. 1 Cir. 5/6/11), 65 So.3d 213, 220, writ denied, 2011-1084 (La. 9/2/11), 68 So.3d 522. Therefore, the jury was free to choose to accept the testimony of Mr. Robert that a major reconstruction took place in 1965, and that DOTD should have complied with the standards in effect at the time (as well as the testimony of Dr. Blaschke that using AASHTO's definition at the time, the 1965 project could have been considered a major reconstruction) and/or the evidence presented that the shoulder and slope were not in conformity with DOTD's 1965 plans, and thus, defective.
DOTD claims that while the absence of shoulder and the adjacent open waterway was certainly dangerous, it was not unreasonably dangerous under the duty-risk analysis. Whether an unreasonably dangerous condition existed is measured by a "risk-utility" test, which relevant factors are: (1) the utility of the complained-of-condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of social utility or whether it is dangerous by nature. Broussard v. State, Office of State Bldgs., 2012-1238 (La. 4/5/13), 113 So.3d 175, 184. Whether a road condition is unreasonably dangerous is a question of fact and a trial court's finding that road conditions are dangerous is reviewed under the manifest error standard. Cormier, 748 So.2d at 1128. Because the determination of whether a defective thing presents an unreasonable risk of harm "encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court." Broussard , 113 So.3d at 185-86 (quoting Reed v. Wal-Mart Stores, Inc., 97-1174 (La. 3/4/98), 708 So.2d 362, 364-65 ). Accordingly we apply these precepts to the present case and evaluate the relevant factors.
(1) Utility
Both DOTD and plaintiffs agree that the utility of the roadway and drainage structure was high. Because drainage areas help make travel along the roads of the state more safe, their utility is great. Oster v. Dep't of Transp. & Dev., 582 So.2d 1285, 1289 (La. 1991).
(2) Likelihood and Magnitude of Harm
DOTD asserts that the likelihood of this accident happening was very low, essentially nonexistent, since there was an absence of even a single accident in this area and it was a rural area. Plaintiffs respond that DOTD's assertion is unsubstantiated as there is no evidence in the record with regard to prior accidents. The only testimony *896 in the record regarding prior accidents is that of Trooper Hall who testified that he had never investigated an accident at this site.
The Louisiana Supreme Court has determined that the absence of prior reported injuries may be one of many factors for the trier of fact to consider, but it is not an absolute bar to recovery. There may exist an unreasonable risk of harm even where the plaintiff's injury was the first reported at a certain place. Broussard, 113 So.3d at 187 ; Abolofia v. Board of Supervisors of Louisiana State Univ. & Agr. & Mech. Coll., 2014-0593 (La. App. 1 Cir. 1/27/15), 2015 WL 782831, *4 (unpublished opinion) (lack of others being injured by the presence of a pole did not support finding that pole did not present an unreasonable risk of harm); Burdis v. Lafourche Parish Police Jury , 618 So.2d 971, 977 (La. App. 1 Cir.), writ denied, 620 So.2d 843 (La. 1993) (lack of prior accidents did not support finding that curve did not present unreasonable risk of harm, noting that governmental authority owes a duty to an inattentive traveler). While there was no testimony as to prior accidents in the area, a lack thereof would not preclude a finding of an increased likelihood of harm.
The plaintiffs argue that harm was more likely to result because this was a popular fishing area. Mr. Elisar testified that DOTD did take pedestrians into consideration predominantly in urban settings where pedestrian facilities already existed or in areas where pedestrians may congregate. The evidence presented was that the accident site was routinely used for fishing, the very same activity plaintiffs were engaged in on the date of the accident.
The likelihood of injury due to pedestrian activity has admittedly been recognized by DOTD in urban areas. The plaintiffs presented evidence that this area regularly was used by pedestrians, thereby indicating a likelihood of harm. In Landry v. City of Abbeville, 625 So.2d 655, 657 (La. App. 3 Cir. 1993), writ denied, 93-2820 (La. 1/28/94), 630 So.2d 789, the court held that a hole located in the parking lane of a public street created an unreasonable risk of harm. In analyzing the risk-utility test, the court determined that because the hole in question was large and located in an area where foot traffic would probably be frequent, the likelihood of harm was great. Landry, 625 So. 2d at 657. In the present case, it was reasonable for the jury to conclude that people fishing in this area could be placed in harm's way by a motorist who left the roadway and could not recover. Therefore, we find the evidence supports a finding that an accident was more likely to occur at the site of this accident considering its use by pedestrians. Neither party disputes that the magnitude of harm was tremendous.[6]
(3) Costs
The expert testimony presented by Mr. Tekell and Mr. Robert was that the most appropriate way to maintain the utility of the location would have been to install a guardrail. DOTD argues that the cost to install the guardrail at the site of this accident, $ 75,000.00, was cost-prohibitive, and relies on Myers, 493 So.2d at 1173, *897 which stated, "many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences and other objects." Therefore, in Myers the Louisiana Supreme Court agreed with DOTD's expert that "it would be physically and financially impossible to bring all of the state's roads up to modern standards" and the failure of DOTD to reconstruct the state's highways to meet modern standards does not establish the existence of a hazardous defect. Myers, 493 So.2d at 1173.
The cost of repair to be considered includes not just the costs of repairing the single defect in question, but the cost of repairing all similar or worse defects existing. Boyle v. Bd. Of Sup'rs, Louisiana State Univ., 96-1158 (La. 1/14/97), 685 So.2d 1080, 1083. Therefore, we find that the placement of a guardrail at the site of this accident would also include the cost of repairing all existing similar defects, and it would be unrealistic to place the burden of such costs upon DOTD. See Myers, 493 So.2d at 1173.
Alternatively, plaintiffs aver that fencing or warning signs should have been installed by DOTD in an effort to warn of the condition. This theory was advanced by Mr. Tekell in his testimony and acknowledged by Dr. Blaschke that had he been aware there was an issue with fishing in the area, it would have been logical to him to take these precautions. Mr. Tekell testified that the installation of fencing or signs to keep pedestrians out of the area would present a generally lower cost. Given the magnitude of the potential harm, it is reasonable to find that the cost of implementing warning measures would be low.
(4) Nature of Activity
Finally, we look to plaintiffs' activities in terms of social utility, or whether the activities are dangerous by nature. DOTD argues that while the activity of fishing is perfectly acceptable and reasonable, the plaintiffs were fishing off of the road with traffic speeding by and that the nature of the conduct, fishing, has no connection to vehicular use. We find this argument inapposite. DOTD alleged at trial that the plaintiffs were comparatively at fault for the accident. The jury found both Mr. Johnson and Mr. Lanus to have no fault in causing or contributing to the injuries. DOTD has not assigned as error that the jury incorrectly determined the comparative fault of the plaintiffs. Furthermore, we do not find fishing to be an inherently dangerous activity, which is one that requires special precautions at all times to avoid injury. Black's Law Dictionary (10th ed. 2014); See LeBlanc v. City of Abbeville, 2018-206 (La. App. 3 Cir. 10/17/18), 259 So.3d 372, 385 (stepping on a storm grate not inherently dangerous); Broussard, 113 So.3d at 192-93 (delivery of office supplies not inherently dangerous). Unlike the plaintiff in Ramos v. State, Dep't of Transp. & Dev., 2012-1389 (La. App. 3 Cir. 4/3/13), 112 So.3d 991, 994, writ denied, 2013-1020 (La. 6/14/13), 118 So.3d 1091, who knew the depth of the water into which he jumped, rendering himself a quadriplegic, there is no evidence that the plaintiffs in the present case were aware of any inherently dangerous nature associated with their activity at the accident site.
While DOTD argues that the activity of recreational fishing has no connection to vehicular use, this argument ignores DOTD's well-settled duty to maintain the area off the shoulder of the road, but within the right-of-way, in such a condition that it does not present an unreasonable risk of harm to motorists using the adjacent roadway or to others, such as pedestrians who are using the area in a reasonably prudent manner. Cormier, 748 So.2d at 1127.
*898 Based on the circumstances particular to this case, the testimony from lay and expert witnesses, along with the photographs and other documentary evidence submitted in connection with their testimony, we conclude that the jury had a reasonable factual basis in the record for its finding that the roadway and/or right-of-way was unreasonably dangerous in its normal use. The jury could have reasonably concluded that DOTD should have at least warned the public of the potential danger by installing signs and/or erecting fencing to deter pedestrians from congregating in the area. We do not find that the jury erred in balancing the likelihood and magnitude of harm against the social utility of the thing, including the cost to defendant of avoiding the harm, based on the evidence in the record. Therefore, we cannot find that the jury's findings regarding the unreasonably dangerous condition of Highway 928 and/or its right-of-way were manifestly erroneous. See Moss v. State, 2007-1686 (La. App. 1 Cir. 8/8/08), 993 So.2d 687, 702, writ denied, 2008-2166 (La. 11/14/08), 996 So.2d 1092.
Actual or Constructive Knowledge
We now address the third factor of Netecke, i.e, whether DOTD had actual or constructive knowledge of the defect. DOTD asserts that it did not have actual or constructive knowledge of a defect which caused the injury as required by La. R.S. 9:2800(C). DOTD relies on the testimony of Mr. Elisar and Ms. Taylor, both who traveled Highway 928 regularly and denied any knowledge of fishing in the area, to argue that no reasonable trier of fact could have concluded that DOTD knew or should have known of the need to safeguard this area.
While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to discover that which is easily discoverable. Hager v. State, Dep't of Transp. & Dev., 2006-1557 (La. App. 1 Cir. 1/16/08), 978 So.2d 454, 467-68, writs denied, 2008-0347, 2008-0385 (La. 4/18/08), 978 So.2d 349. The evidence at trial was that DOTD conducted bi-weekly inspections of Highway 928. The jury was instructed that bi-weekly inspections can support a finding that DOTD had constructive knowledge of defects in a roadway or right-of-way. See Hager, 978 So.2d at 468. There was also ample testimony that people fished in this area over the course of several years. The trier of fact is charged with assessing the credibility of the witnesses and, in doing so, is free to accept or reject, in whole or in part, the testimony of any witness. Commercial Flooring and Mini Blinds, Inc. v. Edenfield, 2013-0523 (La. App. 1 Cir. 2/14/14), 138 So.3d 30, 40. Based on the foregoing, the jury could have reasonably determined that DOTD had constructive knowledge of fishing activity at this location.
Causation
In addressing DOTD's assignments of error numbers seven and nine, we now address the fourth Netecke factor and must determine whether DOTD's breach of duty was a cause-in-fact of the resulting harm. DOTD argues that no defect caused Ms. Taylor to leave the roadway, and she did not attempt to regain the roadway. DOTD maintains that the width of the shoulder, steepness of the slope, and the failure to place a guardrail were not substantial factors in bringing about the accident. DOTD claims that because no defect on the paved roadway caused Ms. Taylor to leave the roadway, it cannot be liable to the plaintiffs. DOTD asserts that the experts agreed that even if the slope had been at a 3:1 ratio and the shoulder *899 was 3 feet wide, the accident would have occurred.
Both Mr. Tekell and Mr. Robert opined that the design of Highway 928, including the lack of an adequate shoulder and an excessive slope, caused this accident. Dr. Blaschke testified that driver error caused the accident. However, he stated in his report that once Ms. Taylor exited the paved portion of the roadway, then the roadside environment became part of the crash scenario. Mr. Robert and Mr. Tekell agreed the shoulder was not usable by a motorist. Mr. Robert testified that a wider shoulder and even a 3:1 slope, as called for by DOTD plans, would have given Ms. Taylor more time to react and would have changed the trajectory of her vehicle, thereby making the condition of Highway 928 a cause of the accident.
There was also conflicting testimony regarding the precise timing of the accident and Ms. Taylor's efforts to regain the roadway. Ms. Taylor testified that after a vehicle swerved toward her lane, she turned her steering wheel to try to get back on the roadway, but the vehicle started shaking and she could not get back into her lane of travel. Although Mr. Tekell testified that Ms. Taylor struck the plaintiffs one second or slightly more after she left the roadway, he calculated that based on her speed on the slope, and the fact that she was braking, she therefore had time to apply her brakes, while going down the slope. Mr. Robert acknowledged that Ms. Taylor did not have a lot of time to maneuver, especially when confronted with the slope. Dr. Blaschke indicated that it was not realistic to think Ms. Taylor could struggle or turn.
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause in fact. In other words, the inquiry is whether the defendant contributed to plaintiff's harm. Guzman v. State, 95-0957 (La. App. 1 Cir. 12/15/95), 664 So.2d 1343, 1351. Furthermore, the failure of a driver to maintain control of a vehicle does not relieve DOTD of its duty to keep the highways safe. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. Campbell, 648 So.2d at 902.
In Moss , this court found that the decedent tried to avoid a collision with an oncoming car that came into his lane of travel, but was unable to leave the roadway due to a narrow lane of travel, an extremely narrow shoulder, and a steep ditch. Therefore, even though the vehicle which crossed the center line was also at fault, there was reasonable evidence for the jury to conclude that "but for" the hazardous condition of the roadway, the decedent could have avoided the accident. Moss, 993 So.2d at 703-04.
In Brown, 707 So.2d at 1243, plaintiffs' experts testified that the defect of excessive slope where a single-vehicle accident occurred was the cause of the accident. DOTD's expert testified that the driver had no time to react, and there were no brake marks or other evidence to indicate that the driver attempted to regain the roadway. Therefore, DOTD's expert opined that the sloping condition of the shoulder had little, if any influence, on the accident. Brown, 707 So.2d at 1243-44. The Louisiana Supreme Court noted that based on the conflicting testimony, the trial court found the slope of the shoulder posed an unreasonable risk of harm to motorists, and therefore, rendered the shoulder defective and was a contributing cause of the accident. Because a reasonable factual basis for the findings of the trial court existed, the Louisiana Supreme Court affirmed the holding that the slope of the shoulder *900 was defective and a contributing cause of the accident.
DOTD made a similar argument, as it does here, in Everhardt v. Louisiana Dept. of Transp. & Dev., 2007-0981 (La. App. 4 Cir. 2/20/08), 978 So.2d 1036, 1052, where DOTD's expert testified that the motorist had only 3.8 seconds before his truck went off the road, giving him no time to look up and see an edge line marker warning him to steer back on the roadway. In Everhardt, the appeals court noted that the parties presented two opposing views of the evidence regarding causation, and the factfinder's choice of alternative permissible views cannot be considered manifestly erroneous or clearly wrong. Everhardt, 978 So.2d at 1053.
The record reflects that the jury was presented with competing views of the evidence and conflicting expert opinions regarding the roadway, shoulder, and slope and the cause of the accident herein. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Everhardt , 978 So.2d at 1053 ; Guzman v. State, 95-0957 (La. App. 1 Cir. 12/15/95), 664 So.2d 1343, 1348. As the court is free to accept or reject an expert's opinion, the trial court's choice not to credit an expert's opinion regarding causation is not error. Brignac v. Louisiana Farm Bureau Ins. Agency, Inc., 2010-1467 (La. App. 1 Cir. 9/7/11), 2011 WL 4000986, *3 (unpublished opinion).
Considering due deference to the factfinder's credibility determinations, we cannot find that the factfinder was manifestly erroneous in determining that the condition of the roadway was a cause-in-fact of the accident. Therefore, on the record before us, we find that the jury did not err in finding DOTD liable as a reasonable factual basis exists for the jury's finding that the shoulder and/or right-of-way was unreasonably dangerous, DOTD had notice of same, and the roadside environment was a cause-in-fact of the plaintiffs' damages.
Duty
In DOTD's assignments of error numbers one, two, three, and six, DOTD challenges the jury's inherent finding that it owed a duty under the circumstances of this case. DOTD maintains that its duty to provide reasonably safe roadways did not extend to risks having no connection to the roadway or its function. In every determination, all the circumstances surrounding the particular accident under review must be considered to determine whether DOTD's legal duty encompassed the risk which caused the plaintiffs' damages. Oster, 582 So.2d at 1289.
In support of its argument, DOTD relies on the cases of Wilkinson v. Town of Baker, 506 So.2d 739, 742 (La. App. 1 Cir. 1987) ; Perkins v. State, Dep't of Transp. & Dev., 515 So.2d 553, 555 (La. App. 1 Cir.), writ denied, 515 So.2d 1114 (La. 1987) ; Oster, 582 So.2d at 1291 ; Voelkel v. State, 95-0147 (La. App. 1 Cir. 10/6/95), 671 So.2d 478, 481, writ denied, 95-2676 (La. 1/12/96), 667 So.2d 523 ; Graves, 703 So.2d at 572 ; and Capone v. Ormet Corp., 2001-0060 (La. App. 1 Cir. 6/21/02), 822 So.2d 684, 693.
In Wilkinson, the driver was forced off the roadway into a ditch by another vehicle and struck a sewer system manhole cover. The court held that the city had no duty to construct and maintain a portion of a manhole cover in the ditch that did not pose an unreasonable risk of harm for vehicles in the ditch. Wilkinson, 506 So.2d at 742. The alleged defect in the manhole cover was found not to cause injury to the plaintiff. Following Wilkinson, the court in Perkins held there was no duty on the part of DOTD to construct a utility pole such that it did not present an unreasonable risk of harm for vehicles in the ditch. In connection *901 with the alleged hazard in the shoulder, the court found that the failure of DOTD to reconstruct the State's highways to modern standards did not establish the existence of a hazardous defect. Perkins, 515 So.2d at 555. The court in Oster held that DOTD had no duty to make a drainage ditch in its right-of-way safe for one driving an off-road vehicle in the ditch at a high rate of speed. Employing the unreasonable risk of harm analysis, the court in Oster found that the land in question did not present an unreasonable risk of harm under the facts of the case. The court noted that the plaintiff was driving a dirt bike at a high rate of speed in an area neither designated nor intended for vehicular use. Oster, 582 So.2d at 1291. Voelkel involved a motorist who veered off the paved roadway, overturned in a roadside ditch, and whose injuries were exacerbated by contact with raw sewage. There was no defect alleged in the roadway or shoulder. The court held that "the State has no duty to maintain its drainage ditches in such a way that they do not pose an unreasonable risk of harm for vehicles in those ditches" and found that the State's duty to regulate sanitation and maintain water quality did not encompass the risk that an individual's injury following a motor vehicle accident will be exacerbated by contact with polluted water. Voelkel, 671 So.2d at 481. In Graves, the court found the plaintiff's excessive speed and impaired status (blood alcohol level of 0.29%) were the cause-in-fact of plaintiff's injuries as opposed to the shrubbery on the side of the roadway, which was the alleged defect. Graves, 703 So.2d at 568, 572-74.
Prior to the decision in Capone, the Netecke court, citing Oster, 582 So.2d at 1289-91, reiterated that DOTD must maintain the shoulders and area off the shoulders, within its right-of-way, in such a condition that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Netecke, 747 So.2d at 494. Thereafter, the court in Capone recognized that previous Louisiana Supreme Court decisions have jurisprudentially created the duty for a roadside ditch to be engineered not only to efficiently drain water from the highway, but the ditch also must be engineered so as not to present an unreasonable risk of harm to motorists using the adjacent roadway. Capone, 822 So.2d at 702. In Capone, the plaintiff left the roadway and struck an I-beam located in a roadside ditch. The court found that the plaintiff was driving too fast for the existing road and weather conditions, lost control of his vehicle, over corrected, and drove off the roadway, across the shoulder, and into roadside ditch. Capone, 822 So.2d at 690. Through an application of the Netecke factors, the court found the economic considerations particularly pertinent in finding that the shoulder, slope, and lack of clear zone for recovery did not constitute an unreasonable risk of harm. Capone, 822 So.2d at 703-05.
We find the cases relied upon by DOTD to be distinguishable from the present case. In the instant case, unlike Wilkinson , the jury found that the alleged defect in the roadway or right-of-way did cause injury to the plaintiffs. In contrast to Perkins, the plaintiffs in the present case do not contend that the roadway at issue was required to be reconstructed to modern standards. However, the jury could have reasonably accepted the testimony of Mr. Robert that DOTD did not follow the AASHTO standards in effect during the 1965 project and did not follow its own design plans. The jury was also presented with the testimony of Dr. Blaschke that under the AASHTO standards in effect in 1965, the 1965 project could be considered *902 a major reconstruction. He further agreed that if he were making a decision and had knowledge regarding fishing in the area, it would be logical to erect a sign and/or fence to keep pedestrians from being there. Oster involved the use of the right-of-way by a speeding off-road vehicle unlike the present case where Ms. Taylor's vehicle was placed into the right-of-way by the narrow shoulder and steep slope. In Voelkel, there was no claim, as in this case, that any defect in the roadway, shoulder, or slope caused the vehicle to travel into the ditch. Unlike Graves, in this case, there is no evidence of impairment of Ms. Taylor. There is also no evidence that Ms. Taylor's vehicle was travelling too fast for the roadway, as in Capone. In further contrast to the facts of Capone, the cost of expropriation of property and reconstruction of the roadway, shoulder, and roadside ditch is not implicated herein. Rather, the jury could have reasonably concluded that the defect could have been corrected by a less financially burdensome solution.
DOTD's assertion that there is a requirement that the plaintiffs' activities be related to the roadway or its function is without merit. In Hager , 978 So.2d at 467-68, the court found DOTD liable for a defective roadway due to lack of signage regarding a winding roadway after pedestrians who were raking leaves in their own front yard were struck by a motor vehicle which inadvertently ran off the roadway. The activities of the plaintiffs in Hager were clearly not related to the roadway or its function.
Furthermore, in Ramos , the court recognized that DOTD owes a duty to maintain the public highways, shoulders, and surrounding area in a condition that is safe for persons exercising ordinary care and reasonable prudence. Although this duty technically applies to the motoring public, the jurisprudence has found that it extends to pedestrians as well. Ramos , 112 So.3d at 995. In Ramos , the court acknowledged that DOTD owed a duty to those in the right-of-way using it in a reasonably prudent manner, even though the plaintiffs activity had no relationship to the roadway or vehicular use. However, the court found that the presence of a rope swing above a shallow creek within DOTD's right-of-way was not unreasonably dangerous due to plaintiff's knowledge of the depth of the water. Ramos, 112 So.3d at 995.
Using the duty-risk analysis outlined in Netecke, we find no error, based on the facts and circumstances of this case, in the jury's inherent finding that DOTD's legal duty to design and maintain the roadway, the shoulder, and the slope immediately adjacent to it, and to warn about the hazards created by this condition, encompassed the risk of injury to the plaintiffs.
Excluded Evidence
In DOTD's assignment of error number ten, DOTD challenges the trial court's granting of the plaintiffs' motion in limine and excluding evidence of Ms. Taylor's twenty-year history of seizures and "black-outs," which could have been a cause of the accident. DOTD proffered the evidence. DOTD claims that the medical records of Ms. Taylor show that she had epilepsy; that multiple neurologists had implored her to remain on her anti-seizure medication; and that she ignored these recommendations by choosing to cease taking this medication weeks before the accident. DOTD also claims that the medical records show that on the day following the accident Ms. Taylor requested her treating physician, Dr. Kevin Callerame, to restart her anti-seizure medication. DOTD seeks to have an inference drawn from this information that the accident was caused by a seizure.
DOTD's complaint is that the trial court ruled that medical evidence that showed *903 some possible seizure activity that ended at least two years before this accident was not admissible pursuant to La. C.E. art. 403. All relevant evidence is admissible absent other causes for its exclusion. La. C.E. art. 402. Relevant evidence may be deemed inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or waste of time. La. C.E. art. 403.
The trial court refused to allow the medical evidence because there was no evidence that Ms. Taylor had any seizure activity on the day of this accident. Dr. Callerame was the only person to testify as to a possible seizure disorder of Ms. Taylor. He stated that be began treating Ms. Taylor on September 28, 2012, for a possible seizure. However, since that time, she had not had a seizure. Because Ms. Taylor was seizure free for six months, she was allowed to drive without being on medication. He also testified that her post-accident state was not consistent with her having had a seizure. He did not believe it was more probable than not that Ms. Taylor had a seizure on the day of the accident. He specifically testified, "I haven't heard anything that tells me she had a seizure."
As there was no evidence to support the conclusion that Ms. Taylor had a seizure at the time of the accident, had the trial court admitted the evidence, it would have encouraged the jury to speculate that she might have had a seizure. Louisiana Code of Evidence article 403 is intended to prevent such speculation. The danger of unfair prejudice from such speculation is too great and substantially outweighs any probative value of her history of seizures. In Tingle v. American Home Assur. Co., 2010-71 (La. App. 3 Cir. 6/2/10), 40 So.3d 1169, 1174, writs denied, 2010-1580, 2010-1578, 2010-1564 ( La. 10/29/10), 48 So.3d 1095, and 2010-1563, 2010-1562 ( La. 10/29/10), 48 So.3d 1096, the trial court excluded evidence of drug use by a mother and father the night before and the morning of an automobile accident. The trial court found that the relevance of the evidence of the parents' drug use was outweighed by its potential to prejudice the jury.
The trial court ruled that the medical records evidencing Ms. Taylor's prior seizure history was not admissible as the probative value greatly outweighed their prejudicial effect. Because the trial court is granted broad discretion in making evidentiary rulings, which is not to be disturbed absent clear abuse, we find that the decision to exclude the medical evidence of Ms. Taylor's prior history of seizure activity was not an abuse of discretion. See Travis v. Spitale's Bar, Inc., 2012-1366 (La. App. 1 Cir. 8/14/13), 122 So.3d 1118, 1126, writ denied, 2013-2409 (La. 1/10/14), 130 So.3d 327, and writ denied, 2013-2447 (La. 1/10/14), 130 So.3d 329.
Allocation of Fault
In DOTD's assignment of error number eleven, DOTD challenges the jury's allocation of 60% fault to it and 40% fault to Ms. Taylor. DOTD argues that it was Ms. Taylor's over-reaction, not the roadway, which caused the loss, and therefore, she should have been allocated all or the greater share of fault by the jury. The plaintiffs argue that Mr. Tekell testified that "a primary contributor to this crash" was the defective design and maintenance of the highway. They assert that Ms. Taylor should have been assessed less than 40% fault, since all she did was slightly sway to the right, but was then caught in a non-recoverable slope.
*904 A trier of fact's allocation of fault will not be disturbed unless it is found to be manifestly erroneous or clearly wrong. Hebert v. Rapides Parish Police Jury, 2006-2001 (La. 4/11/07), 974 So.2d 635, 654. The trier of fact is charged with assessing the credibility of the witnesses and, in doing so, is free to accept or reject, in whole or in part, the testimony of any witness. Commercial Flooring and Mini Blinds, 138 So.3d at 40. The jury chose to allocate a greater percentage of fault to DOTD. The jury's allocation is supported by Ms. Taylor's testimony that she left the roadway because she perceived that another vehicle was going to enter her lane of travel and was prevented from recovering the roadway because of the narrow shoulder and slope of the adjacent area.
A motorist owes a legal duty to use reasonable care in the operation and control of his vehicle. See La. 32:58; Fontenot v. Patterson Ins., 2009-0669 (La. 10/20/09), 23 So.3d 259, 268. A motorist's duty of reasonable care includes the duty to keep his vehicle under control and to maintain a proper lookout for hazards. Williams v. Dean, 96-1481 (La. App. 1 Cir. 5/9/97), 694 So.2d 1195, 1204. In the present case, the jury recognized Ms. Taylor's duty and allocated a percentage of fault to her.
In Petre, the driver momentarily took her eyes off the road and the wheels of her car left the paved surface. She then attempted to turn the wheels to reenter the highway, but failed to apply the brakes and traveled along a ditch until she hit a culvert. She was unable to recover the roadway due to a narrow shoulder and a slope which was less steep than the one in the instant case. As in this case, the shoulder was only eighteen inches wide. Petre, 817 So.2d at 1112. The Supreme Court held that the record supported the lower courts' findings that the width of the shoulder as well as the slope of the adjacent ditch was a substantial factor in causing the damages and that the road was unreasonably dangerous. The trial court's allocation of 50% fault to each party was affirmed, even though the driver was intoxicated. Petre , 817 So.2d at 1110, 1115.
In the present case, there is no evidence that Ms. Taylor was intoxicated or distracted in any other manner. The evidence is that she left the roadway to avoid a collision with another vehicle approaching from the opposite direction. Once she left the roadway, due to the narrow shoulder and the non-recoverable slope, she was unable to recover the roadway. We cannot say that the jury's allocation of fault was manifestly erroneous.
ANSWERS TO APPEAL
Mr. Johnson answered the appeal seeking to increase the general damages awarded by the jury and to reduce the allocation of fault assigned to Ms. Taylor. The Lanuses also answered the appeal seeking to reduce the allocation of fault assigned to Ms. Taylor.
With regard to Mr. Johnson's request for an increase of the award for general damages:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, *905 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The jury awarded Mr. Johnson $ 357,000.00 in general damages. His answer to the appeal summarily asserts that the general damages should be increased for "past pain and suffering and loss of enjoyment of life; and awarding damages for scarring and disfigurement." Included in Mr. Johnson's general damages award was $ 25,000.00 for loss of enjoyment of life, but the jury declined to award any amount for scarring and disfigurement. Mr. Johnson provides no specifics as to how or why, based on the record before us, the general damage award was insufficient. After a thorough review of the record, we cannot say that the general damage award is less than that which a reasonable trier of fact could assess for the effects of this particular injury to this particular plaintiff. Therefore, Mr. Johnson's answer to the appeal seeking an increase in general damages is denied.
Since we have affirmed the trial court's allocation of fault on appeal, finding that a trier of fact's allocation of fault will not be disturbed unless it is found to be manifestly erroneous or clearly wrong, the issues raised in Mr. Johnson's and the Lanuses' answers to appeal are denied as moot. See Hebert, 974 So.2d at 654.
CONCLUSION
For the above and foregoing reasons, the January 11, 2017 judgment of the trial court is affirmed and the answers to appeal filed by Mitchell Johnson, Jr., and David and Shayla Lanus are denied. All costs of this appeal are assessed against the State of Louisiana, through the Department of Transportation and Development in the amount of $ 11,728.00.
AFFIRMED; ANSWERS TO APPEAL DENIED.
Higginbotham, J. concurs and assigns reasons.
Holdridge, J. concurs in part w/ dissents in part
HIGGINBOTHAM, J., CONCURS AND ASSIGNS REASONS.
I respectfully concur with the decision of the majority finding no manifest error in the jury's decision, because the law requires an appellate court to exercise great restraint before upsetting a jury verdict. However, I write separately to express my concern that, extending DOTD's duty to maintain the public roadways in a condition that is reasonably safe to persons fishing on the side of the roadway creates a dangerous precedent, which should be limited to the particular facts presented to this jury.
HOLDRIDGE, J., concurs in part and dissents in part.
I respectfully concur in part and dissent in part. I agree that the DOTD owed a duty to the plaintiffs, who were fishing in a body of water located in the DOTD's right-of-way, a mere 13.8 feet from the paved portion of the roadway. I further agree that the DOTD knew or should have known that the body of water created an unreasonable risk of harm to the plaintiffs since it was located so close to a busy highway in Ascension Parish. I also agree that the DOTD failed to take any corrective measures, such as a fence or sign warning the plaintiffs of the danger of fishing in a body of water so close to a busy highway. I further agree that the defect, the body of water close to the highway without any sign or fence, was a cause-in-fact of plaintiffs' injuries. However, I question the jury's allocation of fault wherein the DOTD was allocated 60% of the fault and the clearly negligent driver was allocated only 40% of the fault. Applying *906 the standard set forth in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La. 1985), the negligent driver in this case was the major cause of the accident in question. The lowest percentage of fault that could have been allocated to the negligent driver would be 60%. Therefore, I would reverse the jury's allocation of fault and allocate the DOTD with 40% of the fault and Shawnette Taylor with 60% of the fault. See Clement v. Frey, 95-1119 (La. 1/16/96), 666 So.2d 607, 611.

We note, however, that despite the use of the word "judgment," the February 6, 2017 document is not a final, appealable judgment. A final, appealable judgment must contain decretal language, and it must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied. See Jenkins v. Recovery Technology Investors, 2002-1788 (La. App. 1 Cir. 6/27/03), 858 So.2d 598, 600 ; Carter v. Williamson Eye Center, 2001-2016 (La. App. 1 Cir. 11/27/02), 837 So.2d 43, 44. The February 6, 2017 document is the trial court's written reasons clarifying that the bystander damages claimed by plaintiffs are not "derivative" of the plaintiffs' wrongful death claims, and thereby, not subject to the maximum limit of $ 500,000.00 pursuant to La. R.S. 13:5106. The trial court's "clarification" is not a reversal or alteration of its earlier ruling on January 11, 2017. Appeals are taken from judgments, not the reasons for judgment. Greater New Orleans Expressway Comm'n v. Olivier, 2002-2795 (La. 11/18/03), 860 So.2d 22, 24. The "clarification" is not a judgment and is not appealable. Taylor v. Dowling Gosslee & Assocs., Inc., 44,654 (La. App. 2 Cir. 10/7/09), 22 So.3d 246, 252, writ denied , 2009-2420 (La. 2/5/10), 27 So.3d 299.

Ms. Taylor acknowledged that she had given a statement at the time of the accident indicating that two trucks were in the roadway and a car came around them causing her to go off the paved portion. Indicating that she was confused at the time, she stated that the prior statement was inaccurate. She subsequently gave a statement to police approximately a week later, which she stated was more accurate.

AASHTO is the American Association of State Highway and Transportation Officials, which publishes guidelines to highway agencies to promote adequate highway design and highway safety.

Although the record actually says "lack of an inadequate shoulder," this court must assume Mr. Robert meant either the "lack of an adequate shoulder" or that there was an "inadequate shoulder."

A pedestrian is defined by the Louisiana Highway Regulatory Act, in pertinent part, as "any person afoot." La. R.S. 32.1(48).

We recognize that this prong of the "risk-utility" test includes the open and obvious nature of the condition. If the adverse condition or defect is open and obvious, defendants may have no duty to protect or warn against the hazard and the condition may not be unreasonably dangerous. Charan v. Bowman, 2006-0882 (La. App. 1 Cir. 8/1/07), 965 So.2d 466, 474, writ denied, 2007-1773 (La. 11/9/07), 967 So.2d 505. However, no issue was raised by appellants at trial or on appeal whether the combination of factors which contributed to the conditions at the site was open and obvious.